J-M08001-19

2019 PA Super 307

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| SITA DIP, | |
| Appellee | No. 1054 EDA 2019 |

Appeal from the Order Entered April 12, 2019
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):  CP-51-CR-0006971-2018

BEFORE:  BENDER, P.J.E., KUNSELMAN, J., and MURRAY, J.

OPINION BY BENDER, P.J.E.:                    **FILED OCTOBER 16, 2019**

In this interlocutory appeal, the Commonwealth contends that the trial court abused its discretion by denying its "Motion to Disqualify Judge Scott DiClaudio."[1]  The Commonwealth alleges that Judge DiClaudio's relationship to his domestic partner ("DP"), a former employee of the Office of the District Attorney of Philadelphia, presents an appearance of impropriety due to DP's filing of a charge of racial discrimination against the district attorney's office following her dismissal.  After careful review, we affirm.

The facts concerning the criminal case against Sita Dip, Appellee, are not germane to the disposition of this appeal.  Indeed, "Appellee takes no position in this matter."  Appellee's Brief at 5.  Instead, the unique facts and allegations before us concern only the dispute that has arisen between the district attorney's office and Judge DiClaudio.

---

[1] **See** Motion to Disqualify Judge Scott DiClaudio, 4/11/19 ("Recusal Motion").

In 2015, Judge DiClaudio was elected to the First Judicial District of Pennsylvania, otherwise known as the Court of Common Pleas of Philadelphia County. From January of 2016 until the present day, he has served in the Criminal Division of the First Judicial District in various capacities. Trial Court Opinion (TCO), 8/12/19, at 2. "At the time he began his term, he had already been in a long[-]term relationship with [DP], who had been employed as an Assistant District Attorney in Philadelphia County since 2013." *Id.*

"Mr. Larry Krasner began his term as the Philadelphia District Attorney in January [of] 2018. [DP] worked … for approximately fourteen months under [District Attorney] Krasner." *Id.* DP never appeared before Judge DiClaudio before or during Mr. Krasner's tenure as District Attorney, and prior to the instant matter, no party had ever sought Judge DiClaudio's recusal due to his relationship with DP. *Id.* at 6.

On February 9, 2019, DP left the district attorney's office. *Id.* at 2. Soon thereafter, she "filed a confidential [charge] with the Equal Employment Opportunity Commission …, alleging that she had been forced to leave on the basis of racial discrimination." *Id.*[2] Two months later, on April 11, 2019, the

---

[2] In the Recusal Motion, the district attorney alleged that DP filed the charge with the Pennsylvania Human Relations Commission. Recusal Motion at 2 ¶ 4. The Commonwealth never attempted to enter the charge into the record—a common theme in this case—and, thus, we cannot resolve this factual discrepancy; however, this inconsistency is not pertinent to our disposition of this matter. It is enough that we know that DP has filed a charge of racial discrimination with a government agency.

district attorney filed the Recusal Motion in the above-captioned case. Until then, "[t]he [charge of racial discrimination] had remained confidential and unknown to the public at large[.]" *Id.* at 2.

Judge DiClaudio addressed the issues raised in the Recusal Motion during hearings held on April 9, 10, and 12 of 2019.[3] At the April 9th hearing, the Commonwealth initially "explained that its [recusal] motion[s] w[ere] based on the appearance of partiality caused by [DP]'s [charge of racial discrimination], and not any specific partial or biased act." Commonwealth's Brief at 7.[4] Nevertheless, in support of the recusal motions, the Commonwealth alleged that Judge DiClaudio had engaged in several improper *ex parte* communications with employees of the district attorney's office before and after DP's allegation.[5] ***See*** N.T., 4/9/19, at 6-7. The

---

[3] Although the at-issue Recusal Motion was not filed until April 11, 2019, that was not the Commonwealth's first attempt to seek Judge DiClaudio's disqualification based on the charge of racial discrimination; the Commonwealth began seeking Judge DiClaudio's recusal a few days earlier in all "cases in which [the district attorney's office] represented the Commonwealth." Commonwealth's Brief at 6.

[4] As the trial court's opinion does not provide a detailed accounting of what transpired during these hearings, we rely on the Commonwealth's summary of the facts where they appear to be uncontested for ease of disposition.

[5] The Commonwealth alleged that during DP's employment at the district attorney's office, "Judge DiClaudio personally communicated with multiple supervisors at [the district attorney's office]." Recusal Motion at 2 n.1. "In some of those communications, he urged that [DP] be promoted to a supervisory position in the [o]ffice's Juvenile Unit." ***Id.*** Futhermore, the Commonwealth claimed that after receiving the Commonwealth's initial recusal motions, "Judge DiClaudio engaged (or attempted to engage) in *ex*

Commonwealth asked Judge DiClaudio to order an evidentiary hearing before a different judge to address the factual allegations it had made concerning those communications. *Id.* at 7, 9, 12, 14-15. "By the end of the hearing, Judge DiClaudio had acknowledged the existence of [DP]'s race discrimination [charge] against the [district attorney's office], and appeared to admit the existence of his conversations with members of [the district attorney's office] about her employment months earlier, as well as his *ex parte* communications about the [recusal] motions the day before. He continued, however, to challenge the content of [those] conversations." Commonwealth's Brief at 7. Judge DiClaudio held the recusal motion(s) under advisement at the end of the April 9, 2019 hearing.

Meanwhile, the Commonwealth filed recusal motions in all of its cases before Judge DiClaudio. On April 10, 2019, the Commonwealth continued to argue for Judge DiClaudio's recusal in the cases scheduled for that day. During those arguments, Judge DiClaudio noted several unrelated situations where he believed the district attorney's office had demonstrated an appearance of impropriety. "These examples were somehow meant to show why Judge DiClaudio should not" recuse himself from cases involving the district attorney. *Id.* at 9. "Ultimately, Judge DiClaudio denied the Commonwealth's" recusal motions. *Id.*

---

*parte* communications with a number of lawyers from the Office, including with a supervisor to whom Judge DiClaudio stated, *inter alia*, that if the [district attorney's o]ffice continued to seek the [c]ourt's recusal, things would get 'ugly' and District Attorney Krasner could end up in jail." *Id.* at 3 n.2.

"The Commonwealth also filed [recusal] motions [before] Judge DiClaudio in four cases scheduled before him on April 12, 2019. [Appellee]'s case was one of them…." ***Id.*** "Judge DiClaudio asked [Appellee] whether he thought he could be fair, and [Appellee] responded that he did." ***Id.*** at 10. Ultimately, Judge DiClaudio denied the Recusal Motion in Appellee's case. Thereafter,

> [t]he Commonwealth immediately asked Judge DiClaudio to certify his ruling for interlocutory appeal, and presented him with a motion. When Judge DiClaudio refused even to consider it, the Commonwealth promptly filed a notice of appeal and asked the court not to proceed in the case. Judge DiClaudio denied the Commonwealth's request and prepared to proceed to trial.
>
> But the case could not be tried that day because the police witness was unavailable in the afternoon, and it had to be continued until the next week. Despite the Commonwealth's appeal, Judge DiClaudio continued to list the case for trial. The Commonwealth filed its motion to certify the court's ruling for interlocutory appeal that same day, and the court denied it the following week. The Commonwealth also moved to stay the trial, but the court took no action on that motion. The Commonwealth was finally able to stay [Appellee]'s trial by filing an emergency motion with this Court, which this Court granted.
>
> The trial court issued a Pa.R.A.P. 1925(b) order, and the Commonwealth filed a statement of matters complained of on appeal.

***Id.*** at 10-11.

The trial court issued its Rule 1925(a) opinion on August 12, 2019. The Commonwealth now presents the following questions for our review:

> I.    After she was not promoted to a supervisory position and her employment with the Philadelphia District Attorney's Office ended, the trial court's domestic partner filed a complaint against the [o]ffice, which alleged that [it] discriminated against her because she is white. The [district

- 5 -

attorney's office] represents the Commonwealth of Pennsylvania in this case. Did the trial court abuse its discretion and err as a matter of law by refusing to disqualify itself where the Commonwealth is a party in this case?

II. To the extent the trial court disputes the Commonwealth's factual claims, and those facts are necessary to the resolution of this case, did the trial court abuse its discretion by refusing to refer issues of disputed fact to another judge when the court had personal knowledge of those facts?

Commonwealth's Brief at 4.

"The standards for recusal are well established. It is the burden of the party requesting recusal to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially." ***Commonwealth v. Abu-Jamal***, 720 A.2d 79, 89 (Pa. 1998).

> In considering a recusal request, the jurist must first make a conscientious determination of his or her ability to assess the case in an impartial manner, free of personal bias or interest in the outcome. The jurist must then consider whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. This is a personal and unreviewable decision that only the jurist can make. Where a jurist rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be overruled on appeal but for an abuse of discretion. In reviewing a denial of a disqualification motion, we recognize that our judges are honorable, fair and competent.

***Id.*** (internal citations omitted).

The Code of Judicial Conduct dictates that a "judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and ***impartially***." Pa. Code of Judicial Conduct, Canon 2.2 (emphasis added). 'Impartiality' is a concept more often invoked in principle than defined with particularity. John Stuart Mill described the term "as an obligation of justice"

that requires the state of "being exclusively influenced by the considerations which it is supposed ought to influence the particular case in hand; and resisting the solicitation of any motives which prompt to conduct different from what those considerations would dictate." JOHN STUART MILL, UTILITARIANISM 45 (Batoche Books 2011) (1863).[6] Thus, impartiality is not the absence of influences external to the matter at hand; judges exist in the real world, not behind a veil of ideals. Instead, as Mill suggests, a jurist achieves impartiality by successfully resisting the unavoidable presence of external influences that might affect him or her. As our Judicial Code dictates, "[a] judge shall not **permit** family, social, political, financial, or other interests or relationships to influence the judge's judicial conduct or judgment." Pa. Code of Judicial Conduct, Cannon 2.4(A) (emphasis added). Thus, we assume that a jurist will possess interests and relationships that might conceivably influence their judgment but, in the normal course of events, the mere presence of an interest or relationship that could theoretically affect a judicial decision does not create a presumption of partiality.

Rather, "[r]ecusal is required wherever there is **substantial doubt** as to the jurist's ability to preside impartially." **In the Interest of McFall**, 617 A.2d 707, 713 (Pa. 1992) (emphasis added). "A jurist's impartiality is called into question whenever there are factors or circumstances that may reasonably question the jurist's impartiality in the matter." **Id.** Thus, "[i]n

---

[6] https://socialsciences.mcmaster.ca/econ/ugcm/3ll3/mill/utilitarianism.pdf.

order for the integrity of the judiciary to be compromised, we have held that a judge's behavior is not required to rise to a level of actual prejudice, but the appearance of impropriety is sufficient." *Id.* at 712. In this regard, the appearance of impropriety sufficient to disqualify a judge exists when "a significant minority of the lay community could reasonably question the court's impartiality." *Commonwealth v. Bryant*, 476 A.2d 422, 426 (Pa. Super. 1984) (quoting *Commonwealth v. Darush*, 459 A.2d 727, 732 (Pa. 1983)).

Here, Judge DiClaudio expressed his confidence in his ability to impartially judge cases involving the district attorney's office. TCO at 3 ("[DP] did not communicate anything to this [c]ourt about the substance of her claim and this court would refuse to hear any such information, precisely because it takes its impartiality so seriously."). He also ruled that his relationship to DP does not create an appearance of impropriety because:

> In this case, the mere fact [that DP] filed [the charge of racial discrimination] would not create a perception in a reasonable person's mind that this [c]ourt violated the Rules of Judicial Conduct or engaged in conduct that reflects adversely on the Judge's honesty, impartiality, temperament[,] or fitness to serve as Judge. This [c]ourt has never made any comments regarding the potential success or failure of [DP]'s claim and a reasonable person observing this [c]ourt[] would see that all litigants are treated fairly and respectfully. The [d]istrict [a]ttorney's [o]ffice simply has no basis to conclude that the reasonable person would have any view other than seeing this [c]ourt for what it is, an impartial and fair jurist.

*Id.* at 4.

For ease of disposition, we first address the Commonwealth's second claim. The Commonwealth argues that we should consider the Recusal Motion

- 8 -

filed in response to DP's charge of racial discrimination in light of further allegations it makes regarding Judge DiClaudio's conduct. However, in the three hearings held by Judge DiClaudio concerning the Commonwealth's recusal motions in this and other cases, the Commonwealth refused to present any witnesses before the court concerning the alleged *ex parte* communications the judge had with members of the district attorney's office, despite Judge DiClaudio's repeated attempts to hear such evidence. **See** N.T., 4/9/19, at 9; N.T., 4/10/19, at 6, 10-11; N.T., 4/12/19, at 10.[7] Nevertheless, the Commonwealth maintains that "[h]ad he held an evidentiary hearing, Judge DiClaudio would have been required to evaluate his own credibility against that of any potential witness. Under such circumstances, a different judge must conduct the evidentiary hearing." Commonwealth's Brief at 24.

---

[7] For example, during the April 12, 2019 hearing, the following exchange between Judge DiClaudio and Assistant District Attorney Paul George occurred:

> THE COURT: Do you have any evidence to present today, at all?
> MR. GEORGE: No. For the --
> THE COURT: Any witnesses you wish to call at all?
> MR. GEORGE: For the reasons previously stated --
> THE COURT: Yes or no?
> MR. GEORGE: -- I do not.
> THE COURT: Do you have anybody who will go under oath and make these allegations?
> MR. GEORGE: Not before this [c]ourt as fact-finder because of the unique situation.

N.T., 4/12/19, at 10.

It is true that "no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome." *In Re Murchison*, 349 U.S. 133, 136 (1955). However, recusal motions are routinely addressed in the first instance by the judge whose recusal is sought. *Abu-Jamal*, 720 A.2d at 89 ("As a general rule, a motion for recusal is initially directed to and decided by the jurist whose impartiality is being challenged."). Therefore, it cannot be the case that any question of fact even remotely involving a judge's impartiality requires a separate hearing before a separate judge. Instead, the general rule is that a party seeking the recusal of a judge, at a minimum, must satisfy a burden of production and persuasion to show that the recusal claim is not frivolous. This may require the presentation of witnesses or evidence before the judge whose recusal is sought.

There are times when a judge must refer a recusal motion to another judge. For instance, in *Mun. Publications, Inc. v. Ct. of Com. Pleas of Philadelphia County*, 489 A.2d 1286, 1287 (Pa. 1985), the appellees/defendants filed a motion seeking recusal of the trial court judge, the Honorable Bernard Snyder, based on the allegation that Judge Snyder was biased in favor of the appellant's/plaintiff's counsel. Judge Snyder initially referred the recusal matter to another judge, but then vacated that order and scheduled a recusal hearing before himself. *Id.* Judge Snyder held recusal hearings over the course of several weeks. During those hearings, he "gave testimony during the proceedings over which he presided." *Id.* Ultimately, he denied the recusal motion.

Addressing the matter on appeal, our Supreme Court stated:

At this stage we emphasize that we are not deciding whether [the judge] should be disqualified from presiding over the underlying libel action. We are concerned only with whether he may properly take evidence and rule on the motion for his recusal under the unique circumstances presented by this matter. The allegations on which the recusal motion was based focused upon a purported personal relationship between Judge Snyder and counsel for plaintiff Edgehill in the libel suit, and specifically upon alleged *ex parte* discussions between them in chambers concerning the case, including the recusal motion. Taken as a whole those allegations, if true, would require Judge Snyder's disqualification from the libel action and necessitate a new trial.

…

The crucial aspect of the disqualification proceedings is the fact that Judge Snyder actually permitted himself to be called as a witness and decided to give testimony concerning his own conduct. Thus he not only had personal knowledge of disputed facts but was in a position to rule on objections to his own testimony and to assess his own credibility in light of conflicting evidence. Under such extraordinary circumstances, it was clearly inappropriate for Judge Snyder to preside over the recusal hearing.

*Id.* at 1289. Thus, our Supreme Court concluded that Judge Snyder "must be

disqualified from deciding the recusal motion." *Id.* at 1290.

However, our Supreme Court warned:

This does not mean that we will permit a party who is dissatisfied with the progress of the trial mid-stream to arbitrarily attempt to cause the disqualification of the presiding judge. Judge shopping has been universally condemned, and will not be tolerated at any stage of the proceedings. Thus, where fabricated, frivolous or scurrilous charges are raised against the presiding judge during the course of the proceeding, the court may summarily dismiss those objections without hearing where the judge is satisfied that the complaint is wholly without foundation. In such case the complaining party may assign the accusation as a basis for post-trial relief and, if necessary, a record can be developed at that

- 11 -

stage and in that context. Where, as here, a judge concludes that the allegations justify an evidentiary hearing **in which he will testify**, it then becomes incumbent upon that judge to step aside for the appointment of another judge to hear and rule upon the issue of disqualification.

*Id.* at 1289–90 (citations omitted; emphasis added).

The instant matter is easily distinguishable from **Mun. Publications, Inc.** Although the Commonwealth is correct in stating that Judge DiClaudio expressed disagreement with the Commonwealth regarding the nature of his conversations with members of the district attorney's office, he did not do so in his capacity as a witness at an evidentiary hearing, nor was he making a credibility determination. Had Judge DiClaudio held a hearing during which he testified before himself, or had he assessed the credibility of other witnesses based on his own recollection of events, this matter would fall squarely within the rule set forth in **Mun. Publications, Inc.** However, no such events occurred below. Instead, the Commonwealth flatly refused to present any witnesses before the trial court, ostensibly based on the theory that Judge DiClaudio would have acted in a similar manner to Judge Snyder in **Mun. Publications, Inc.** However, this Court cannot entertain any such conjecture, as we are instead compelled to assume "that our judges are honorable, fair and competent" until they demonstrate otherwise. **Abu-Jamal**, 720 A.2d at 89.

We must assume, therefore, that Judge DiClaudio could have received the potential witnesses' testimony to make a threshold determination of whether the allegations made in the Commonwealth's motions and arguments

- 12 -

were "wholly without foundation." **Mun. Publications, Inc.**, 489 A.2d at 1290. A judge may then dismiss a recusal motion based on "fabricated, frivolous or scurrilous charges" **Id.**

Instantly, if the Commonwealth's witnesses had failed to testify in accordance with the Commonwealth's allegations, then Judge DiClaudio could have disregarded those allegations without making any credibility determinations at all. Indeed, because the Commonwealth continues to maintain that any actual bias on the part of Judge DiClaudio is not at issue, the actual truthfulness of those allegations are less relevant than the appearance of the allegations, assuming the accusations are not patently frivolous and/or without foundation.

However, the Commonwealth failed to place on the record any evidence for the claims regarding Judge DiClaudio's *ex parte* communications with employees from the district attorney's office, depriving Judge DiClaudio of the ability to make a threshold determination whether those allegations were frivolous. While Judge DiClaudio was not entitled to evaluate the credibility of those potential witnesses against his own memory or his own testimony, he was entitled to determine if the allegations had some testimonial or evidentiary foundation, or whether they had been fabricated or embellished by the arguments of counsel. If given the opportunity to make such a threshold determination, Judge DiClaudio could have decided whether to recuse, or, alternatively, whether to refer the matter to another judge for a credibility assessment. Accordingly, because the Commonwealth failed to

present evidence supporting the troubling claims it made regarding Judge DiClaudio's *ex parte* communications with the members of the district attorney's office, we conclude that the trial court did not err when it refused to order an evidentiary hearing before another judge.

Consequently, as we turn to assess the Commonwealth's first claim, we consider only the existence of the charge of racial discrimination itself, and the admissions of Judge DiClaudio on the record. That claim asserts that the charge of racial discrimination, alone—which is not contained in the record but whose existence was acknowledged by Judge DiClaudio—is a sufficient basis for this Court to conclude that the court abused its discretion by failing to recuse based on an appearance of impropriety. The relevant legal standard before Judge DiClaudio was whether a significant minority of the lay community could reasonably question the judge's impartiality in Appellee's case given his relationship to DP.[8] ***Bryant***, 476 A.2d at 426.

It is undisputed that the charge of racial discrimination does not directly involve Judge DiClaudio. Judge DiClaudio is not a party to any litigation against the district attorney's office, nor has the Commonwealth alleged that he would be a potential witness in any such action. Rather, the Commonwealth alleges that "[w]hen a close family member, such as a domestic partner, files a [charge of racial discrimination] against counsel for a party appearing before a judge, that judge should grant a disqualification

_____

[8] Hereinafter, the "Significant Minority" standard.

- 14 -

motion because a significant minority of the lay community could reasonably question the judge's impartiality." Commonwealth's Brief at 12.

When assessing the trial court's application of the Significant Minority standard, we cannot poll the lay community, nor is it clear, even if we could conduct such a poll, how we would quantify what percentage of the lay public constitutes a significant minority thereof. By invoking the lay community rather than the public at large, we assume that the standard dictates that the lower court exclude professional legal opinions on the matter, opinions which might theoretically place more faith in the impartiality of the judiciary than the average layperson. Thus, granting that assumption, the Significant Minority standard sets the bar for establishing an appearance of impropriety quite low.

Regardless of the uncertainties involved in applying the Significant Minority standard, this Court's standard of review of that decision—whether the trial court abused its discretion in applying the Significant Minority standard—is highly deferential to the trial court's reasoning. As is now axiomatic:

> The term 'discretion' imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. 2000) (quoting *Coker v. S.M. Flickinger Co., Inc.*, 625 A.2d 1181, 1185 (Pa. 1993)).

In support of its recusal claim, the Commonwealth cites few Pennsylvania cases, and gives scant analysis of the cases it does mention. Instead, the Commonwealth substantially relies on its own interpretation of the Significant Minority standard, suggesting that it is simply obvious that Judge DiClaudio's relationship to DP creates an appearance of impropriety due to DP's charge of racial discrimination against the district attorney's office. For the reasons that follow, we do not agree that it is so obvious that the charge of racial discrimination, alone, creates an appearance of impropriety.

The Commonwealth first asserts that the trial court applied the wrong standard—that it focused exclusively on the presence or absence of actual bias, rather than on the appearance of impropriety. Commonwealth's Brief at 15. We disagree. While the trial court did engage in banter with the Commonwealth over the appearance of actual bias during the April 2019 hearings, the court's Rule 1925(a) opinion clearly indicates that it also considered "whether this [c]ourt[']s continued involvement creates an appearance of impropriety…." TCO at 3. The trial court attempts to parse out a difference between the Significant Minority standard and the standard set forth in the Judicial Code of Conduct. *See id.* at 3-4. In this regard, the trial court suggests that the at-issue standard is whether the judge's "conduct would create in reasonable minds a perception that the judge violated" the Judicial Code or engaged in conduct "that reflects adversely on the judge's

- 16 -

honesty, impartiality, temperament, or fitness to serve as judge." *Id.* (citing Judicial Conduct Rule 1.2, Comment (5)). This is a distinction without a difference. In essence, both tests assert a reasonable person standard—whether a reasonable person would question the impartiality of the judge in light of the circumstances that gave rise to the recusal motion. Even if there is a significant distinction between these standards, the Commonwealth has not raised, and therefore has waived, any argument in that regard. However, as to the Commonwealth's preserved argument that the trial court **exclusively** considered the presence or absence of actual bias, the record belies that claim. The trial court did not merely consider whether it harbored actual bias toward the district attorney's office.

Next, the Commonwealth contends that "[o]ther courts to consider the question have all concluded that a judge who is engaged in litigation against one of the parties' legal representative must disqualify himself or herself[,]" and that "[t]he same is true when a member of the judge's family is the legal adversary of a lawyer appearing before that judge." Commonwealth's Brief at 16. However, the second proposition does not necessarily follow from the first. There is no strict formula for recusal. Instead, the governing question is whether a reasonable person (layperson or otherwise) would question Judge DiClaudio's impartiality in Appellee's case because of the unrelated matter of his domestic partner's initiation of a charge of racial discrimination against the district attorney's office.

Notably, the Commonwealth fails to cite any precedent that even approaches controlling authority in support of its abuse of discretion/recusal claim. Some of the cases cited by the Commonwealth are not even controlling in this jurisdiction. Nevertheless, out of an abundance of caution, we will discuss each in turn and then distinguish them from the instant matter.[9]

In **McFall**, former Judge Mary Rose Fante Cunningham "became an undercover agent for federal law enforcement authorities in exchange for a promise that those authorities would make her cooperation known to any agency that chose to prosecute her for accepting a gift from a potential litigant." **McFall**, 617 A.2d at 711. "The Defender Association of Philadelphia, on behalf of twenty-nine appellees, filed motions seeking the nullification of all judicial actions taken in their respective cases by Cunningham while she was simultaneously acting as an undercover agent. Anthony McFall was one of the appellees represented by the Defender Association." **Id.** (footnote

_____

[9] The Commonwealth's citation of **Czuprynski v. Bay Cir. J.**, 420 N.W.2d 141 (Mich. App. 1988), is particularly unhelpful, as the underlying facts of that case are not discussed in any detail in the court's opinion, and because Michigan's standard for review of the denial of a recusal motion require a showing of actual bias for reversal. **Id.** at 143 ("Review of an order granting or denying recusal of a trial judge for bias or prejudice is for abuse of discretion and the record must show actual bias or prejudice."). Moreover, the Commonwealth's analysis of that case, indicating that it affirmed "the removal of a judge from all cases in which a lawyer who filed a grievance against the judge represented a party before that judge" is not accurate. Commonwealth's Brief at 16 n.6. Indeed, the **Czuprynski** court appears to have rejected that form of requested relief, and instead indicated that recusal motions should always be granted on a case-by-case basis. **See Czuprynski**, 420 N.W.2d at 144-45.

omitted). Those motions were assigned to a different judge, who found for the appellees. The Commonwealth appealed that decision, arguing that the judge had no "direct, personal, substantial, pecuniary interest in the cases in which she presided." *Id.* at 712.

Our Supreme Court ultimately affirmed this Court's decision to affirm, reasoning as follows:

> In the instant case, we again find that the appearance of impropriety is sufficient justification for the grant of new proceedings before another judge. We find that Cunningham's course of conduct created the appearance of impropriety. First, she accepted a gift from a potential litigant. Second, she became aware of the fact that the F.B.I. had discovered her misconduct. Finally, Cunningham decided to assist the F.B.I. in their investigation of other judges suspected of accepting gifts. Cunningham's assistance was in exchange for the F.B.I.'s promise to disclose her cooperation to any other authorities who chose to prosecute her. One could reasonably conclude that, under the circumstances, Cunningham's cooperation with the United States Attorney's office cast her in the role of a confederate of the prosecutors in the appellees' cases.

*Id.* at 712–13.

In **Abu-Jamal**, a PCRA[10] petitioner had sought the recusal of the PCRA court judge based on "several newspaper and magazine articles which criticized [the PCRA court judge's] behavior during the PCRA proceedings." **Abu-Jamal**, 720 A.2d at 89. He appealed, *inter alia*, from the judge's denial of his recusal motion. After reviewing the record of those proceedings, our Supreme Court rejected Abu-Jamal's claim, reasoning:

---

[10] Post Conviction Relief Act, 42 Pa.C.S § 9541 *et seq*.

> While there are certainly instances in the record where the judge displays displeasure and/or impatience, those instances were, in large part, a direct result of obstreperous conduct on the part of [the a]ppellant's counsel. The record reveals instances where defense counsel refused to accept a particular ruling offered by the court, relentlessly urging the court to reconsider. Although we certainly do not condone unjustified or indiscriminate rhetoric on the part of a presiding judge, we are nevertheless mindful of the fact that judges, too, are subject to human emotion. It simply cannot be denied that this particular case was one that was not only highly publicized but also highly emotionally charged. As a result, the judge's duty to maintain the judicial decorum of the proceedings was, at times, met with great resistance. Upon review of the entire record, we cannot conclude that any of Judge Sabo's intemperate remarks were unjustified or indiscriminate nor did they evidence a settled bias against [the a]ppellant.

*Id.* at 89–90.

In ***Commonwealth v. Rhodes***, 990 A.2d 732 (Pa. Super. 2009), this Court found that a sentencing court judge had abused his discretion in denying the defendant's recusal motion where the judge refused to reflect on the recusal standard, "sought to justify its decision not to recuse by denying any external affiliation or relationship that would demonstrate bias and then castigated defense counsel for seeking the court's recusal[,]" and where

> the record, which we have examined in exhaustive detail, raises significant concerns that the trial court may have prejudged this case or reached its decision at sentencing on the basis of improper considerations. Although a judge is never constrained to accept a plea, Judge Cunningham accepted Rhodes's plea to Voluntary Manslaughter and, correctly, directed compilation of a presentence report. Having received the report, he then declined to use it and relied instead on police reports he ordered from the Commonwealth, *ex parte*. His use of those reports remained undisclosed to Rhodes's counsel until the sentencing hearing was in progress and the court had already completed and distributed its Statement of Sentencing Rationale to all present in the courtroom, except counsel. Accordingly, Rhodes was deprived of any meaningful opportunity to challenge the layered hearsay of

- 20 -

the reports, which examination of the Statement of Sentencing Rationale verifies served as the primary source of information on which the court made its determination to impose a sentence close to the statutory maximum. In that Statement, as well as its remarks at sentencing, the court stated, repeatedly and unequivocally, that it reached its determination based on Rhodes's commission of a premeditated killing, notwithstanding the fact that premeditation is not an element of the crime to which Rhodes offered her plea. Consistent with its determination concerning premeditation, the court's Statement then repudiated the Commonwealth's sentencing recommendation on the basis of an unrelated case … before it offered the District Attorney any opportunity to respond or explain. To all appearances, the court then made *de facto* findings of fact, seemingly ascribing conduct to Rhodes, *e.g.*, inducing her own labor, that appears nowhere in the charges against her.

*Id.* at 750. We concluded that the sentencing court abused its discretion by denying the various recusal motions "given the cumulative effect of [the judge's] conduct and remarks[,]" based upon which the "court's impartiality could be reasonably questioned." *Id.* at 751.

Similarly, in **Commonwealth v. White**, 910 A.2d 648 (Pa. 2006), our Supreme Court determined that the trial court judge abused her discretion in failing to recuse where she had repeatedly denounced "the short-comings of the legal system" in the type of case before her, a matter involving an 11-year-old defendant accused of murder. *Id.* at 659. The judge had also overtly offered the defendant favorable treatment, "[t]elling the accused that she was going to work hard to do things for her." *Id.* at 658.

In **State v. McCabe**, 987 A.2d 567 (N.J. 2010), the defendant filed a recusal motion because his attorney and the municipal court judge hearing the defendant's case were opposing counsel in an open and unresolved

probate case. The Supreme Court of New Jersey held that the appearance of impropriety clearly existed because the judge and the defendant's attorney "were still adversaries in an open matter." *Id.* at 573.

In *Brewton v. Kelly*, 166 So.2d 834 (Fla. 2d Dist. App. 1964), the defendants filed a recusal motion alleging actual bias because the judge was the target of a Bill of Impeachment signed by the partners of the defendants' attorney.[11] The recusal motion was supported by affidavits from the partners indicating that one had "testified at the impeachment trial before the Senate and assisted the House Manager in the preparation and prosecution of the charges." *Id.* at 836.

In *In re Braswell*, 600 S.E.2d 849, 850 (N.C. 2004), a disciplinary action, the Supreme Court of North Carolina censured a judge for failing to grant recusal in a case where "the plaintiff in that case had an unrelated lawsuit pending against" that judge. *Id.*

Finally, in *State v. Hahn*, 660 N.E.2d 606, 607 (Ind. App. 1996), a judge denied a recusal motion in a criminal case where the judge had been previously prosecuted by the district attorney, a prosecution that had led to the suspension of the judge's license to practice law, which had only recently been reinstated prior to his appointment as judge. The alleged facts supporting the motion for recusal were set forth in an affidavit filed by the

---

[11] The defendants' counsel and his two partners were the only three named partners in their law firm.

deputy prosecutor. The Indiana appeals court reversed the trial court's order denying the motion for recusal.

All of these cases are distinguishable from the instant matter. Here, Judge DiClaudio is not a party to any current litigation against the district attorney's office (or its 'client,' the Commonwealth), unlike the conflicts that arose in **McCabe** and **Braswell**. Judge DiClaudio was not previously prosecuted by the district attorney's office, unlike the issue that arose in **Hahn**.

Judge DiClaudio cohabitates and is in a romantic relationship with DP, and that relationship does give rise to the potential for conflicts of interest. However, DP has not yet filed a lawsuit against the district attorney's office. Rather, DP has initiated a charge of racial discrimination with an administrative agency against the district attorney's office that **may**, eventually, lead to actual litigation. Furthermore, there is no indication in the record that Judge DiClaudio would personally be involved in such potential litigation in any capacity, whatsoever. The Commonwealth suggests that Judge DiClaudio could one day stand to benefit from DP's allegations financially; however, the Commonwealth has produced no evidence to that effect.[12] There is no evidence of record indicating that Judge DiClaudio's and

---

[12] The Commonwealth alleges that "Judge DiClaudio's personal investment in his domestic partner's career gave him an individualized stake in her promotion." Commonwealth's Brief at 19. We reiterate that the record before us does not contain evidence of Judge DiClaudio's text messages in support

DP's finances are substantially intermingled so as to permit such an assumption.

The Commonwealth also contends that Judge DiClaudio's response to the various recusal motions, including the one at issue here, further demonstrates his alleged partiality or bias. In this regard, the Commonwealth first directs our attention to Judge DiClaudio's alleged communication with a prosecutor in the district attorney's office where it is alleged the judge suggested that Mr. Krasner could end up in jail as a result of his pursuit of Judge DiClaudio's recusal. Commonwealth's Brief at 20. However, as noted above, the content of that *ex parte* communication was disputed, and the Commonwealth failed to present the prosecutor as a witness or even provide that prosecutor's version of events in an affidavit. Accordingly, we will not consider those allegations as they are not contained within the record before us.

The Commonwealth also contends that Judge DiClaudio's behavior in the courtroom during the three hearings demonstrates his bias or partiality, in a similar vein to what occurred in **Rhodes** and **White**. However, we conclude that Judge DiClaudio's behavior was more akin to what had occurred in **Abu-Jamal**. The Commonwealth conceded at oral argument that, if

---

of DP's promotion. In any event, it does not immediately follow from Judge DiClaudio's support of DP's career trajectory that he would have financially benefited from her promotion, or that he will benefit should she receive compensation as a result of the charge of racial discrimination or a subsequent lawsuit.

granted, its recusal motions would essentially evict Judge DiClaudio from the Criminal Division entirely, because the district attorney's office is a party to all but a few criminal cases heard in that division. Thus, this case is unique in relation to the relevant case law in that the judge was not simply being asked to recuse from a single case or from cases involving a typical party. Moreover, the Commonwealth was refusing to offer witnesses to substantiate its allegations of misconduct against him. As was the case in *Abu-Jamal*, this created an emotionally charged environment. Judges are human and cannot be reasonably expected to act without any emotion in all circumstances.

However, much of what the Commonwealth refers to as a combative tone by Judge DiClaudio, such as where Judge DiClaudio recounted "a number of instances in which he believed" that the district attorney's office "created [an] appearance of impropriety[,]" could also be construed as his engaging counsel with hypotheticals to aid in his understanding of the standard for recusal. Commonwealth's Brief at 21. That the Commonwealth believes those comments to be "irrelevant to the question at hand" is just another way of saying that it did not believe that Judge DiClaudio's hypotheticals were analogous to the matter at issue. These are, essentially, legal arguments, not clear or obvious instances of Judge DiClaudio's partiality or bias as observed in *Rhodes* or *White*.[13] Instead, Judge DiClaudio's conduct appears to be

---

[13] We also note that in both *Rhodes* and *White*, the respective judges' biases were directed not just at a party, but were instead observed to be directly

more like the conduct observed in ***Abu-Jamal***, which was less than ideal, but excusable in light of the unique circumstances of this case.

In sum, we conclude that it belies reason to suggest that Judge DiClaudio would favor a criminal defendant, or disfavor an individual assistant district attorney working for the district attorney's office, based ***solely*** on DP's filing of the racial discrimination charge. Only the most unreasonable and cynical layperson could harbor such a suspicion based on the ***mere possibility*** of future litigation by a relative[14] of Judge DiClaudio. Indeed, there is also no indication in the record that Judge DiClaudio could use his position to support DP's charge of racial discrimination, or to hinder the district attorney's office's response thereto. The cases before Judge DiClaudio are not related in any way to the subject of the potential litigation of DP's allegations of discrimination against the district attorney's office.[15]

On the other side of the equation, we also note the uniqueness of the district attorney's office in contrast to the typical law firm. A district attorney's

_____

affecting the litigation of the critical issues involved in those cases. We do not say this to suggest that bias or partiality toward a party must dovetail with the matter at issue in the case to warrant recusal, but it does demonstrate that the evidence of bias in those cases, or the appearance thereof, was much stronger than in the instant matter.

[14] We acknowledge that a domestic partner is functionally the equivalent of a spouse under the Judicial Code of Conduct. ***See*** Pa. Code of Judicial Conduct, Cannon 2.11(A)(2).

[15] By contrast, it is undisputed that Judge DiClaudio would have to disqualify himself if asked to oversee litigation flowing from or related to the racial discrimination charge filed by DP.

office does not represent typical clients. It represents the Commonwealth in virtually all matters in the criminal courts of Philadelphia, with the occasional exception where the Commonwealth is represented by the Attorney General's Office. The Philadelphia's Office of the District Attorney is a large institution, containing a multitude of attorneys, making it relatively distinctive in this Commonwealth even among other district attorney's offices. Consequently, the potential for conflicts of interest to arise between the district attorney's office and judges in Philadelphia County is therefore greater than the typical law firm or district attorney's office, yet the ability to mitigate such conflicts is also greater due to the size of the institution. It would appear to be a relatively minor inconvenience for the district attorney's office to assign disinterested assistant district attorneys to Judge DiClaudio's courtroom who are not remotely involved with the matters that gave rise to the racial discrimination charge. This stands in stark contrast to the matter at issue in **Brewton**, where the attorneys involved in the impeachment of that judge were the literal partners of the attorney who sought his recusal. Here, there are various degrees of separation between Judge DiClaudio and the individuals concerned with the charge of racial discrimination filed against the district attorney's office.

For the above reasons, we conclude that the Commonwealth has failed to meet its burden on appeal to establish that the trial court abused its discretion in denying the Recusal Motion. We are loathe to speculate as to what additional circumstances would cause a reasonable person (or layperson)

to doubt Judge DiClaudio's impartiality in all matters involving the district attorney's office. We merely hold that the filing of the charge of racial discrimination, and Judge DiClaudio's in-court response to the recusal motions based on that allegation, do not alone demonstrate an abuse of discretion in 1) his failure to recuse; or 2) his refusal to order an evidentiary hearing before another judge. However, we affirm without prejudice to the Commonwealth's ability to develop the record further.

Order **affirmed** without prejudice. Jurisdiction **relinquished**.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/16/19