J-S20013-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LAMONT CHERRY | : | |
| | : | |
| Appellant | : | No. 1011 MDA 2020 |

Appeal from the PCRA Order Entered July 1, 2020
In the Court of Common Pleas of Luzerne County Criminal Division at
No(s):  CP-40-CR-0003610-2009

BEFORE:  NICHOLS, J., KING, J., and MUSMANNO, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED: NOVEMBER 8, 2021**

Appellant Lamont Cherry appeals from the order denying his timely first Post Conviction Relief Act[1] (PCRA) petition.  Appellant contends that the PCRA court erred in denying his motion to recuse, denying his motion to compel a witness to testify, and denying his PCRA petition asserting that his conviction was based on false and/or flawed expert testimony.  We affirm.

On May 29, 2009, Appellant was babysitting Z.M., the one-year-old daughter of his paramour, Christa Smith.  When Smith returned home, she noticed that Z.M. was limp and foaming at the mouth.  Smith called for an ambulance.  Z.M. was then airlifted to Geisinger Hospital in Danville for surgery.  A CT scan showed that Z.M. had multiple skull fractures, specifically, a piece of bone in Z.M.'s skull had separated from the rest of her skull.  Z.M.

_____

[1] 42 Pa.C.S. §§ 9541-9546.

did not have a laceration on the back of her head or any external bleeding. While Z.M. was in the hospital, Smith asked Appellant what happened to Z.M. Appellant told Smith that Z.M. might have fallen down the stairs and hit her head on the dumbbells at the base of the stairs. The doctors declared that Z.M. was brain dead, therefore, Smith decided to remove Z.M. from life support, after which Z.M. died. Appellant was later charged with the homicide of Z.M.

Frank Maffei, M.D., the chief of pediatric trauma care at Geisinger Hospital, testified at Appellant's trial[2] as an expert in the fields of pediatric medicine, pediatric emergency care, and pediatric critical care. Doctor Maffei observed that Z.M. had retinoschisis, *i.e.*, the retinas of her eyes had detached, and retinal hemorrhage, *i.e.*, there was bleeding in her retinas. Doctor Maffei testified that retinal detachment plus retinal hemorrhage is "almost uniquely associated with abusive head trauma in small children and infants." N.T. Trial, 10/18/11, at 245. Doctor Maffei explained "we have never seen this injury in children outside of abusive head trauma except in three documented cases. One was a fall from a three-story window; one was a crush injury, the child was crushed; and then the other one was a motor vehicle accident." *Id.* at 245-46. Z.M. also had a subdural hemorrhage, *i.e.*, bleeding under the dural space around her brain. *Id.* at 239. Doctor Maffei

_____

[2] A previous jury trial, which concluded on January 14, 2011, was declared a mistrial. N.T. Trial, 1/14/11, at 741-42, 748-49; *see also Commonwealth v. Cherry*, 245 MDA 2012, 2013 WL 11257205, at *1 n.1 (Pa. Super. filed July 12, 2013) (unpublished mem.).

testified that Z.M. falling down the stairs and hitting her head on the metal dumbbells would not cause the "constellation" of injuries that Z.M. had. *Id.* at 250. Doctor Maffei concluded within a reasonable degree of medical certainty that Z.M. was the victim of abusive head trauma.

Samuel Land, M.D., testified as an expert in forensic pathology. Doctor Land performed Z.M.'s autopsy. Doctor Land observed during the autopsy that Z.M. had swelling in her left eye, but she did not have any bruising on her arms and legs, or any other significant external injuries. Doctor Land explained that after an internal examination, he found that Z.M. had bruising on the back of her head inside her scalp, two skull fractures going downwards towards the base of her skull, one on the left side of her head and the other on the right side. Z.M. also had bleeding around her brain and swelling of the brain. Doctor Land also found retinal hemorrhage in both of her eyes. Z.M. also had torn muscles and torn ligaments in her neck where her neck joined her head. Lastly, Z.M. had bruising under both of her buttocks with no evidence of healing, which Doctor Land explained meant that the bruises occurred immediately prior to her admission to the hospital, therefore, he concluded they occurred close in time to her head injuries.

Doctor Land opined that when retinal hemorrhaging is seen immediately after the child's injury, "it is significant, because it suggests that there was some type of rotational force placed on the child's head[,]" meaning that the child's head moved back and forth in different directions. *Id.* at 277. Doctor Land explained that a child would have experienced linear force, *i.e.*, force in

- 3 -

only in one direction, if a child fell flat and hit his or her head. *Id.* He further characterized the torn muscles and ligaments in Z.M.'s neck as consistent with "whiplash type injuries in which the head is flung forward and backwards . . . ." *Id.* at 278. Doctor Land concluded that Z.M.'s head injuries were fatal, specifically that she "died as a result of blunt force trauma to the head." *Id.* at 278, 280. Doctor Land ruled Z.M.'s death a homicide. He testified that he did not believe Z.M. fell down the stairs and hit her head on the dumbbells at the base of the stairs because he did not observe injuries, such as a laceration or an abrasion, that would result from hitting a hard object like the dumbbells. *Id.* at 283-84. Doctor Land explained his conclusion as follows:

> I believe that she was violently manipulated and slammed into something hard, either a wall, a floor. It could even be something like a cushion or mattress, but you usually don't see skull fractures in those events, you see other--the same--the other injuries that we see, but you don't see the skull fracture. So, most likely, it's my opinion, she was slammed against something hard and flat, like a wall or a floor.

*Id.* at 289.

John Lenox, M.D, Ph.D., was admitted as an expert in fields of head and neck injury, trauma and medical research, injury causation, and biomechanics. Doctor Lenox testified that it was more probable than not that Z.M. was injured in a fall down the stairs and hit her head on dumbbells at the base of the stairs. Further, Doctor Lenox explained that while there is a debate among pediatricians, forensic pathologists, neurologists, and neurosurgeons about whether a fall could produce injuries like Z.M.'s, but in the

- 4 -

biomechanical community there was no debate because there are documented cases of falls causing those types of injuries.

Marguerite Salam-Host, M.D., testified as an expert in the areas of pathology and pediatric pathology. Doctor Salam-Host testified that there is debate within the medical field concerning whether retinal hemorrhages should automatically be determined as child abuse. Doctor Salam-Host explained that she reviewed the police report, the autopsy report, medical records, and Doctor Land's testimony from a previous proceeding. Based on her review of those materials, she concluded that Z.M.'s death was caused by blunt force trauma to the head from an accidental fall.

Michael D'Ambrosio, D.O., testified as an expert in the fields of emergency medicine and neurology. Doctor D'Ambrosio reviewed Z.M.'s medical records as well as the testimony of Doctors Maffei, Lenox, and Salam-Host. Doctor D'Ambrosio concluded that Z.M.'s injuries could have been caused either by abuse or by an accident.

On October 20, 2011, a jury found Appellant guilty of third-degree murder. The trial court sentenced Appellant to a term of twenty to forty years of incarceration on December 21, 2011. On direct appeal, this Court affirmed Appellant's sentence. *See Commonwealth v. Cherry*, 2013 WL 11257205, at *1. Appellant did not file a petition for allowance of appeal with our Supreme Court.

A previous panel of this Court summarized the subsequent procedural history of this case as follows:

On May 28, 2014, the PCRA court[3] appointed Jeffrey Yelen, Esquire ("Attorney Yelen") as PCRA counsel. On June 4, 2014[fn2], Appellant filed the instant *pro se* PCRA Petition, his first, averring, *inter alia*, that his trial counsel had been ineffective. The Commonwealth filed a Response Brief on August 11, 2014, responding to each of Appellant's claims raised in his *pro se* PCRA Petition.

> [fn2] Appellant dated his PCRA Petition May 15, 2014, which may explain the appointment of counsel before Appellant filed his *pro se* PCRA Petition as reflected in the docket entries and time stamps.

Attorney Yelen did not file an Amended PCRA Petition, and he did not seek to withdraw pursuant to ***Turner***/***Finley***.[4] Instead, Attorney Yelen appeared at a brief hearing on January 16, 2015, at which Appellant agreed not to present any evidence and submitted his case to the PCRA court on the basis of his *pro se* pleadings alone. [The PCRA court informed Appellant that this hearing was his opportunity to provide testimony in support of his petition and asked if it was his desire to rely on his petition and trial transcripts alone. Appellant replied that it was.] On June 18, 2015,[5] the PCRA court denied Appellant's PCRA Petition.

Appellant filed a timely Notice of Appeal. The PCRA court appointed [Matthew Kelly, Esquire ("Attorney Kelly")] to represent Appellant on appeal. Both Appellant and the PCRA court complied with Pa.R.A.P. 1925.

On June 15, 2016, Attorney Kelly filed a ***Turner***/***Finley*** no-merit letter . . . .

\* \* \*

---

[3] The Honorable Tina Polachek Gartley presided over both of Appellant's trials and Appellant's PCRA proceedings. For consistency, we refer to Judge Polachek Gartley as "the PCRA court" throughout.

[4] ***Commonwealth v. Turner***, 544 A.2d 927 (Pa. 1988); ***Commonwealth v. Finley***, 550 A.2d 213 (Pa. Super. 1988) (*en banc*).

[5] This order was dated June 18, 2014, and time-stamped and docketed on June 18, 2015.

> On August 12, 2016, Cheryl Sturm, Esquire ("Attorney Sturm") filed an Application for Relief seeking to enter her appearance as privately retained counsel. On September 7, 2016, we granted Attorney Kelly's Petition to Withdraw in light of Attorney Sturm's entry of appearance as privately retained counsel . . . .

*Commonwealth v. Cherry*, 155 A.3d 1080, 1081-82 (Pa. Super. 2017) (citations and some footnotes omitted). This Court observed that Attorney Yelen did not file an amended petition or a petition to withdraw under *Turner*/*Finley*. *Id.* at 1083. This Court also noted that the January 16, 2015 PCRA hearing was not a hearing pursuant to *Commonwealth v. Grazier*, 713 A.2d 81 (Pa. 1998). For these reasons, this Court concluded "that Appellant was effectively denied his right to assistance of counsel[,]" vacated the June 18, 2015 order denying Appellant's PCRA petition, and remanded this case for the PCRA court to determine if Attorney Sturm would continue to represent Appellant, and if so, to permit the filing of an amended PCRA petition. *Id.*

Following remand to the PCRA court, Attorney Sturm entered her appearance on behalf of Appellant. Appellant filed a motion for recusal on April 17, 2017, arguing that the PCRA court had failed to hold a *Grazier* hearing after Attorney Yelen failed to file an amended PCRA petition, the PCRA court had prejudged Appellant's PCRA petition, and that the PCRA court erred in declaring a mistrial during Appellant's first trial. Mot. for Recusal, 4/17/17, at 2-8. The PCRA court denied the motion for recusal on May 23, 2017.

Appellant filed a counseled, amended PCRA petition on October 24, 2017 arguing multiple issues, including the alleged use of false and faulty expert

testimony at trial that violated Appellant's due process rights. Appellant also renewed his request for the PCRA court to recuse itself.

**PCRA Court Evidentiary Hearings**

The PCRA court held an evidentiary hearing on May 21, 2018. During that hearing, Appellant presented the testimony of Zhongxue Hua, M.D., Ph.D., and Doctor Maffei. Doctor Hua testified as an expert in the fields of forensic pathology and neuropathology. Doctor Hua had previously testified in cases involving Shaken Baby Syndrome and abusive head trauma. N.T. PCRA Hr'g, 5/21/18, at 24-25. Doctor Hua reviewed Z.M.'s medical records from May 2009, the autopsy report, toxicology report, microscopic report, brain report, autopsy photographs, and the trial transcripts. According to Doctor Hua, Doctor Land concluded that Z.M. had sustained "significant blunt head trauma to the back of head area . . . ." *Id.* at 26. Doctor Hua also concluded that Z.M.'s cause of death was "blunt force head trauma". *Id.* Based on Doctor Land's autopsy report, "the scene photographs, as well as autopsy photos," Doctor Hua concluded that Z.M.'s injury was "consistent with a fall[] backwards, landing on [a] protruding object on the floor[,]" specifically one of the dumbbells. *Id.* at 26, 30. Doctor Hua disagreed with Doctor Land's trial testimony that retinal hemorrhaging is only associated with injuries caused by rotational force. *Id.* at 29. Doctor Hua explained that "retinal hemorrhage can be due to lots of reasons. Rotational injury could cause retinal hemorrhages, . . . but other head injury in general can cause retinal hemorrhage as well." *Id.* Doctor Hua also noted the absence of holding or

grip marks on Z.M., which are bruises caused by an adult holding a child in a shaken baby case. *Id.* at 43-44.

Doctor Hua explained that he was familiar with the Atkinson study, which was published in 2017. *Id.* at 50. The Atkinson study was one of several recently published studies regarding head trauma in infants and young children. *Id.* at 47. In the Atkinson study, there was an examination of young children who suffered retinal hemorrhaging after accidental falls. *Id.*; Appellant's Ex. 5 at 4, R.R. at 689.[6] Doctor Hua characterized the Atkinson study, and others like it, as the result of people "learning from [their] mistake[s]" about Shaken Baby Syndrome and "start[ing] to look at this thing []holistically . . . ." N.T. PCRA Hr'g, 5/21/18, at 47. According to Doctor Hua, thirty years ago, when he was in medical school, the diagnosis for a young child with a skull fracture and bleeding in the brain was always considered child abuse. *Id.* at 45. He stated that after the 2017 Atkinson study, accidental injury should be considered as a possible cause. *Id.* at 50; *see also* R.R. at 689 (concluding, "if a pediatrician or a medical examiner is confronted with a child with a [subdural hemorrhage] and [retinal hemorrhage] and a history of a fall with an occipital impact, in the absence of other signs of maltreatment, accidental injury should be considered. Further research should be conducted regarding this mechanism of history in young children").

---

[6] We may refer to the reproduced record for the parties' convenience.

Doctor Maffei, who testified as an expert at Appellant's trial, also testified at the May 21, 2018 PCRA hearing. He had reviewed the Atkinson study, and stated that he found it "absolutely not compelling[,]" and described it as "the lowest quality of evidence[.]" N.T. PCRA Hr'g, 5/21/18, at 63-64; *see also id.* at 73 (Doctor Maffei opined that the Atkinson study "is not compelling science"). He explained that the Atkinson study was survey based, meaning doctors responded to a survey regarding injuries to minor children those doctors had treated. *Id.* at 66. He noted that none of the eight children documented in the Atkinson study had detached retinas or a complex skull fracture, while Z.M. had both. *Id.* at 64, 77, 83. Doctor Maffei explained that a detached retina is a more severe injury than retinal hemorrhage because of the greater forces involved. *Id.* at 76. He testified that he did not know of any new studies that would change his opinion as to Z.M.'s cause of death. *Id.* at 77, 79-80.

John G. Galaznik, M.D., testified on behalf of Appellant at another evidentiary hearing on August 12, 2019. The PCRA court accepted Doctor Galaznik as an expert in the field of pediatrics with a focus on physical injury of small children. N.T. PCRA Hr'g, 8/12/19, at 29. Doctor Galaznik reviewed Z.M.'s medical records, but did not review the transcript of Appellant's trial. *Id.* at 29, 38.

Doctor Galaznik explained that at the time of Appellant's trial in 2011, the American Academy of Pediatrics (Academy) recognized that abuse and accidents could cause the same type of injuries often referred to as "Shaken

Baby Syndrome." *Id.* at 41-43. He further explained that in 2010, it was the Academy's position that only repetitive acceleration and deceleration, *i.e.*, shaking, could cause retinal detachment and retinal hemorrhaging, and that a single impact, such a slam or an accidental fall, could not cause those injuries. *Id.* at 43-44, 51.

Doctor Galaznik described two studies from 2010 to 2012 that recreated injuries consistent with abuse cases involving shaken babies using piglets and lambs as substitutes for human babies. *Id.* at 52-59. Neither study was able to produce retinal detachment or retinal hemorrhaging in the eyes of the animals shaken for the experiments. *Id.* Doctor Galaznik explained that these studies called into question the medical conclusion that shaking a baby produces retinal damage. *Id.* at 56. Doctor Galaznik proposed an alternate explanation for Z.M.'s injuries: a short distance fall with significant impact could cause an increase in intracranial pressure that would cause the retinal hemorrhaging. *Id.* at 58-59, 78, 81.

Doctor Galaznik described the Atkinson study as a "paradigm shifting study . . . ." *Id.* at 69. He also stated that it was "a pivotal article, not something to be disregarded." *Id.* at 70-71. Doctor Galaznik explained that the current scientific biomechanical research data would not support an assertion[ that shaking caused Z.M.'s injuries]." *Id.* at 71. He concluded that "[s]ince 2011 [] it is now undeniable that [a] short distance head drop could account for large volume subdural bleeding, retinal hemorrhage with [retinal detachment] . . . and death as an accidental injury." *Id.* at 102.

- 11 -

On October 29, 2018, Appellant filed a motion to compel compliance with subpoena for Doctor Samuel Land. Therein Appellant averred that he had served Doctor Land with a subpoena to testify at the PCRA hearing and offered to pay him a witness fee of $100 pursuant to Pa.R.C.P. 234.2(c). Mot. to Compel, 10/29/18, at 1, R.R. at 296. Appellant asserted that Doctor Land replied that he wanted to be paid as if Appellant had retained him as an expert witness. *Id.* Appellant requested that the PCRA court compel Doctor Land's appearance to testify at the PCRA hearing without payment as an expert witness. *Id.* at 2, R.R. at 297. In his brief in support of the motion to compel, Appellant argued he "has the right to recall a witness to confront that witness with new scientific evidence that has come to light since Dr. Land's trial testimony and examine Doctor Land on whether this new evidence would cause [Doctor] Land to change his professional opinion" that Z.M.'s death was caused by being violently slammed against a surface. Appellant's Brief in Supp. of Mot. to Compel, 11/13/18, at 2-3, R.R. at 303-04. Appellant requested that Doctor Land be ordered to appear and testify at the PCRA hearing and be compensated with the ordinary witness fee. *Id.* at 5, R.R. at 306. Appellant alternatively argued that because he had previously been found to be *in forma pauperis* (IFP) and that his family was paying counsel and witness fees, the Commonwealth should pay Doctor Land's witness fee. *Id.* (citing Pa.R.Crim.P. 904(G)).

Doctor Land filed an answer to Appellant's motion to compel, and a supporting brief, requesting that the PCRA court deny the motion to compel

his testimony without being paid his expert witness fee because he was not an ordinary witness.  The Commonwealth also filed an answer to Appellant's motion to compel, arguing that Appellant had not filed a petition for appointment of funds to pay Doctor Land's expert witness fee, and requested that the PCRA court deny Appellant's request for the Commonwealth to pay Doctor Land's expert witness fee.

The PCRA court heard oral argument on Appellant's motion to compel on December 17, 2018.  During oral argument, Appellant, through counsel, again argued that because he had been granted IFP status, he should not be required to pay Doctor Land's expert witness fee.  N.T. Mot. Hr'g, 12/17/18, at 7.  The Commonwealth responded it would have a chilling effect on experts from testifying for the Commonwealth if they could be recalled to testify in PCRA proceedings without compensation.  *Id.* at 10-11.  The PCRA court denied Appellant's motion to compel on May 17, 2019.

The PCRA court issued an opinion and order denying Appellant's PCRA petition on July 1, 2020.[7]  *See* PCRA Ct. Op. & Order, 7/1/20.  Appellant filed a timely notice of appeal on July 30, 2020.  Appellant complied with Pa.R.A.P.

_____

[7] We note that Appellant captioned this appeal as arising from the PCRA court's "June 30, 2020" order.  *See* Notice of Appeal, 7/30/20.  While, the PCRA court's order was dated and docketed June 30, 2020, it was served on July 1, 2020.  Under our appellate rules, the date of entry of an order is "the day the clerk of the court . . . mails or delivers copies of the order to the parties, . . ." Pa.R.A.P. 108(a)(1), (d)(1).  We have amended the caption accordingly.

- 13 -

1925(b).[8]  The PCRA court issued a Rule 1925(a) opinion addressing Appellant's recusal and subpoena issues.  The PCRA court also adopted its July 1, 2020 opinion and order addressing Appellant's claim that his conviction was based on false or flawed expert testimony.

Appellant raises three issues for our review:

1. Whether the PCRA [court] erred when she denied [Appellant's] motions for recusal based on the appearance of bias?

2. Whether the PCRA judge erred and denied due process when she denied the PCRA petition establishing the conviction for third degree murder was based on flawed science supported by false and flawed expert testimony?

3. Whether the PCRA judge erred and denied Appellant's Sixth Amendment right to compulsory process when she did not enforce Appellant's subpoena for the testimony of Samuel Land, M.D.?

Appellant's Brief at 2 (formatting altered).

─────────────────────────

[8] Appellant also raised a claim of ineffective assistance of trial counsel for failing to file a motion to dismiss based on double jeopardy after Appellant's first trial ended in a mistrial.  *See* Appellant's 1925(b) Statement, 9/11/20, at 8-10.  Appellant does not argue this claim in his appellate brief, therefore, that claim is waived.  *See **Commonwealth v. Felder***, 247 A.3d 14, 20 (Pa. Super. 2021) (stating, "an issue identified on appeal but not developed in the appellant's brief is abandoned and, therefore, waived" (citation omitted and formatting altered)).  We note, however, that in his statement of the case, Appellant refers to trial counsel being ineffective for not objecting to the trial court declaring a mistrial.  *See* Appellant's Brief at 20.  Our Rules of Appellate Procedure strictly prohibit argument in a statement of the case.  *See* Pa.R.A.P. 2117(b) (stating "[t]he statement of the case shall not contain any argument").

**Motion to Recuse**

In his first issue, Appellant argues that the PCRA court erred by denying his motion for recusal. *Id.* at 23-29; Appellant's Reply Brief at 19-22. Appellant asserts the PCRA court was biased because it had decided to deny Appellant's 2014 PCRA petition before holding a hearing, as evidenced by the date on the order denying the petition, which was shortly after the date on which the petition was filed and prior to the January 16, 2015 hearing. Appellant's Brief at 24-25. Appellant claims that "reasonable inference from the public record, including the opinion denying the *pro se* PCRA, is that the [PCRA] court made up its mind to deny the PCRA [petition] at the moment it was filed and the[n] gave the PCRA petition no real consideration, at all." *Id.* at 24 (formatting alerted).

Appellant further asserts that the PCRA court was biased against him because it appointed Attorney Yelen as PCRA counsel and Attorney Yelen rendered ineffective assistance. *Id.* at 25; Appellant's Reply Brief at 20. Appellant claims that the PCRA court acted with bias when it appointed Attorney Yelen because the court knew or had reason to know that Attorney Yelen was incompetent. Appellant's Brief at 22. Appellant contends that after Attorney Yelen failed to meet with Appellant and file an amended PCRA petition on his behalf, the PCRA court should have conducted a *Grazier* hearing. *Id.* at 24-25. Appellant contends that the PCRA court violated its obligation "to ensure [Attorney Yelen's] compliance with the duty to" file an amended PCRA petition that would "present the issues in a legally meaningful

- 15 -

fashion to [e]nsure a trial court that all relevant considerations will be brought to its attention[.]" *Id.* at 25 (citation omitted and formatting altered).

The third claim of PCRA court bias Appellant argues on appeal is that the PCRA court prejudiced Appellant by declaring a mistrial during Appellant's first trial after a juror conducted outside research "instead of taking a balanced approach and instructing the jury to disregard any information not presented in open court." *Id.* at 29.

Lastly, Appellant also claims that the PCRA court's denial of his motion to compel Doctor Land to testify and denial of the instant PCRA petition are evidence of the PCRA court's bias.[9] *Id.* at 28-29; Appellant's Reply Brief at 20-21.

The Commonwealth responds that Appellant has failed to carry his burden to establish that the PCRA court was biased or prejudiced such that

---

[9] In the statement of case portion of his brief, Appellant includes additional argument in support of his claim that the PCRA court acted with bias or prejudice in denying his PCRA petition. Specifically, he argues that the PCRA court refused to consider the federal *habeas* cases that he cited in support of his PCRA petition. Appellant's Brief at 18-19. This contention of judicial bias is not included in the argument section of Appellant's brief. As discussed above, our Rules of Appellate Procedure strictly prohibit the inclusion of argument in the statement of the case. *See* Pa.R.A.P. 2117(b). Therefore, we will not consider this allegation with respect to the claims of bias presented in the argument section of Appellant's brief.

Additionally, we remind Appellant's counsel that in addition to not containing argument, the statement of the case must present a balanced and therefore neutral statement of the facts and procedural history. *See id.* (stating "[i]t is the responsibility of appellant to present in the statement of the case a **balanced presentation of the history of the proceedings** and the respective contentions of the parties" (emphasis added)).

substantial doubt would be raised concerning whether the PCRA court could preside impartially. Commonwealth's Brief at 29-35. Specifically, the Commonwealth claims that the typographical error in the PCRA court's June 18, 2015 order "do not come remotely close to meeting the strict requirements for recusal." *Id.* at 32. The Commonwealth also argues that there is no evidence to support Appellant's claim that the PCRA court appointed an incompetent attorney as his first PCRA counsel. *Id.* at 35.

This Court has stated:

Our standard of review of a trial court's determination not to recuse from hearing a case is exceptionally deferential. We recognize that our trial judges are honorable, fair and competent, and although we employ an abuse of discretion standard, we do so recognizing that the judge himself is best qualified to gauge his ability to preside impartially.

The party who asserts that a trial judge should recuse bears the burden of setting forth specific evidence of bias, prejudice, or unfairness. Furthermore, a decision by the trial court against whom the plea of prejudice is made will not be disturbed absent an abuse of discretion.

*Commonwealth v. Harris*, 979 A.2d 387, 391-92 (Pa. Super. 2009) (citations omitted and formatting altered); *see also Commonwealth v. King*, 839 A.2d 237, 239-40 (Pa. 2003) (explaining that "where a judge has refused to recuse h[er]self, on appeal, we place the burden on the party requesting recusal to establish that the judge abused h[er] discretion" (citation omitted)).

The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of

- 17 -

giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*King*, 839 A.2d at 240 (citation omitted and formatting altered).

This Court has explained that

recusal is required wherever there is substantial doubt as to the jurist's ability to preside impartially. A jurist's impartiality is called into question whenever there are factors or circumstances that may reasonably question the jurist's impartiality in the matter. Thus, in order for the integrity of the judiciary to be compromised, we have held that a judge's behavior is not required to rise to a level of actual prejudice, but the appearance of impropriety is sufficient. In this regard, the appearance of impropriety sufficient to disqualify a judge exists when a significant minority of the lay community could reasonably question the court's impartiality.

*Commonwealth v. Dip*, 221 A.3d 201, 206-07 (Pa. Super. 2019) (citations omitted and formatting altered), *appeal denied*, 229 A.3d 567 (Pa. 2020).

This Court has explained:

In this Commonwealth, a party must seek recusal of a jurist at the earliest possible moment, *i.e.*, when the party knows of the facts that form the basis for a motion to recuse. If the party fails to present a motion to recuse at that time, then the party's recusal issue is time-barred and waived.

*Commonwealth v. Blount*, 207 A.3d 925, 930-31 (Pa. Super. 2019) (citation omitted), *appeal denied*, 218 A.3d 1198 (Pa. 2019).

It is well established "'simply because a judge rules against a defendant

does not establish any bias on the part of the judge against that defendant.'"

*Commonwealth v. McCauley*, 199 A.3d 947, 951 (Pa. Super. 2018) (quoting *Commonwealth v. Travaglia*, 661 A.2d 352, 367 (Pa. 1995)). When reviewing a trial court's denial of a motion to recuse, this Court will not consider evidence of the trial court's bias that allegedly occurred after the date the motion was filed. *See, e.g.*, *Commonwealth v. Williams*, 69 A.3d 735, 750 (Pa. Super. 2013) (relying only on evidence from prior to the date the defendant filed her motion to recuse to conclude the trial judge did not abuse his discretion in denying that motion). Furthermore, "it is well-settled that an appellant cannot bootstrap a series of meritless claims into a cumulative claim of error." *Commonwealth v. Kearney*, 92 A.3d 51, 62 (Pa. Super. 2014) (citations omitted).

A PCRA petitioner has a statutory right to effective counsel on a first PCRA. *Commonwealth v. Holmes*, 79 A.3d 562, 583 (Pa. 2013). Additionally, our Supreme Court has explained that when a defendant seeks to waive the right to counsel at the post-conviction stage of the case or on appeal, the trial court must make "an on-the-record determination . . . that the waiver is a knowing, intelligent, and voluntary one." *Grazier*, 713 A.2d at 82. This Court further explained that "where an indigent, first-time PCRA petitioner was denied his right to counsel—or failed to properly waive that right—this Court is required to raise this error *sua sponte* and remand for the PCRA court to correct that mistake." *Commonwealth v. Stossel*, 17 A.3d 1286, 1290 (Pa. Super. 2011).

Here, the PCRA court explained, in relevant part:

- 19 -

[Appellant] claims that the undersigned judge erred by refusing to recuse herself from Appellant's PCRA Petition for the following reasons:

   1. The first order denying the PCRA Petition was dated shortly after the Petition was filed and included clerical irregularities;

   2. The Court did not hold a **Grazier** hearing or remove Appellant's court appointed PCRA counsel who did not provide effective representation;

                               *       *       *

[Appellant] requested recusal based on the allegation that this court pre judged his petition as evidenced by irregularities in the Order denying his petition. The order was filed on June 18, 2015 and was dated June 18, 2014. This was an obvious clerical error and in no way implies the court pre-judged the merits of the petition without the opportunity for [Appellant] to present his case at a hearing. Similarly, [Appellant] alleges that the court was biased or the appearance of impropriety existed because some of the dates cited in the procedural history portion of the opinion accompanying the order were incorrect. Again, these were clerical, not substantive errors and are certainly not evidence of bias, prejudice or prejudgment. The substance of the opinion discussed the merits of [Appellant's] petition.

Next, [Appellant] sought recusal alleging [Attorney Yelen] provided no representation and, therefore, the [PCRA c]ourt should have held a **Grazier** hearing to determine whether [Appellant] wanted to proceed *pro se*. The Superior Court has determined that [Appellant] was effectively denied his right to assistance of counsel, vacated this [c]ourt's decision and remanded the case so [Appellant] could obtain new counsel and file an amended petition. **Commonwealth v. Cherry**, 155 A.3d 1080, 1083 (Pa. Super. 2017). This, however, does not cast any doubt on the [PCRA c]ourt's continued ability to preside over the case impartially and, as previously discussed, this jurist has never wavered in her ability to preside without prejudice or bias and there is no evidence to suggest otherwise. To the contrary, the court granted multiple requests for continuances and other accommodations requested by [Appellant]. . . . The [PCRA c]ourt granted a motion for [Attorney Yelen] to speak with [Appellant] via telephone. During the January 16, 2015 hearing, [Appellant] confirmed that, per his request, he was provided all of the trial transcripts for his personal review and that he had the opportunity

- 20 -

to review them. At the hearing, [Attorney Yelen] stated that after speaking with [Appellant], it was [Appellant's] decision to proceed on the original petition as opposed to offering testimony. Upon [Attorney Yelen's] confirmation that, upon review of the transcripts, there was nothing additional to offer with respect to recusal, the [PCRA] court likewise confirmed that there was nothing in the motion or transcripts which would lead her to reconsider her decision to deny the motion to recuse.

* * *

In his motion for recusal filed on May 23, 2017, [Appellant] alleged numerous grounds for recusal. None of these allegations constitute evidence that this court was unable to act impartially and without personal bias or prejudice with respect to this matter or raise sufficient grounds for recusal. A series of meritless allegations cannot be combined together to create a simple cumulative claim of bias. *Commonwealth v. Kearney*, 92 A.3d 54, 62 (Pa. Super. 2014). [Appellant's] claims have no merit, and when each are examined individually, they do not form as sufficient basis for recusal, nor are they sufficient when examined as a whole.

This court has presided over this case since 2010. There are no instances in the record where the trial judge displayed or articulated displeasure or impatience toward [Appellant]. After careful consideration of the points raised by [Appellant] in his motion for recusal, this court made a conscientious determination that it was able to assess the case in an impartial manner, without any personal bias toward [Appellant] or the Commonwealth or interest in the outcome. Furthermore, this jurist disagrees that her continued involvement in the case created an appearance of impropriety or would tend to undermine public confidence in the judiciary.

PCRA Ct. Op., 11/13/20, at 3-4, 5-8 (some citations omitted and formatting altered).

Turning to Appellant's first claim of judicial bias, he asserts the date on the PCRA court's order denying his first PCRA petition indicates that the PCRA court did not fairly consider his claims and had decided to deny his PCRA

petition shortly after it was filed, prior to any hearing. We conclude that the record does not support Appellant's claim. Recusal is required "whenever there are factors or circumstances that may **reasonably** question the jurist's impartiality . . . ." **See Dip**, 221 A.3d at 206-07 (emphasis added). We cannot say that the date on the PCRA court's June 18, 2015 order, which the PCRA court stated was a typographical error, is a factor that can **reasonably** call the PCRA court's impartiality into question. **See id.**

In his second claim of judicial bias, that the PCRA court erred by not holding a **Grazier** hearing, we do not find support in the record for his claim. Firstly, the notes of testimony of the January 16, 2015 hearing indicate that Appellant had discussed his PCRA petition with Attorney Yelen and decided that he wanted to proceed without Attorney Yelen filing an amended petition. Further, Appellant did not request to represent himself in this matter prior to or during the January 16, 2015 hearing. Under **Grazier**, a court must conduct a hearing when a defendant requests to proceed *pro se*. **See Grazier**, 713 A.2d at 82. Appellant has not cited any case law that requires a PCRA court to *sua sponte* conduct a **Grazier** hearing if that court believes that PCRA counsel has rendered ineffective assistance. The fact that this Court reversed the PCRA court's June 18, 2015 order because this Court concluded that Attorney Yelen was ineffective does not establish that the PCRA court was biased against Appellant for not holding a *sua sponte* **Grazier** hearing. Lastly, Appellant has not presented any evidence to support his contention that the PCRA court knew or should have known that Attorney Yelen was not

competent to represent Appellant in a PCRA matter. *See Harris*, 979 A.2d at 391-92. Therefore, Appellant has not shown that the PCRA court was biased or acted with prejudice with respect to the appointment of Attorney Yelen in the PCRA proceedings.

Appellant's third claim of bias relating to the PCRA court declaring a mistrial with respect to Appellant's first jury trial is waived because Appellant did not raise this claim at the earliest possible moment. *See Blount*, 207 A.3d at 930-31. Appellant's first trial ended in a mistrial on January 14, 2011, Appellant first requested that the PCRA court recuse itself in his *pro se* PCRA petition on June 4, 2014, after the PCRA court presided over his second trial and sentencing hearing. Therefore, this claim of bias is waived because he did not raise this recusal claim until 2014, more than three years after his second trial in 2011. *See id.*

Lastly, we conclude that Appellant's final claims of bias, relating to the denial of his motion to enforce the subpoena and his PCRA petition are both waived. Both of these decisions occurred after Appellant filed his motion for recusal, and this Court will not consider evidence presented after the filing date of the motion to recuse when evaluating the PCRA court's decision to deny said motion.[10] *See Williams*, 69 A.3d at 750.

---

[10] Even if these claims were not waived, "simply because a judge rules against a defendant does not establish any bias on the part of the judge against that defendant." *See McCauley*, 199 A.3d at 951 (citation and quotation marks omitted). Therefore, Appellant has failed to present evidence that the PCRA court was biased with respect to these claims. *See Harris*, 979 A.2d at 391-92.

Appellant "cannot bootstrap a series of meritless claims into a cumulative claim of error." ***See Kearney***, 92 A.3d at 62. Because Appellant has not met his burden of proving the PCRA court was biased with respect to his individual claims, he cannot use them collectively to establish the PCRA court was biased. ***See id.*** Therefore, we conclude that the PCRA court did not abuse its discretion in denying Appellant's motion to recuse, and he is not due relief on this claim. ***See King***, 839 A.2d at 239-40; ***Harris***, 979 A.2d at 391-92.

**Unreliable Scientific Evidence at Trial**

In his second claim, Appellant argues that the PCRA court erred in denying his PCRA petition arguing that the forensic evidence regarding shaken baby syndrome presented at his second trial was flawed and based on outdated science. Appellant's Brief at 29-34. Specifically, Appellant contends that the evidence presented at the PCRA hearing established that the Commonwealth's experts' conclusion that detached retinas and retinal hemorrhage could not have been caused by a fall was based on outdated medical science. ***Id.*** at 31-32. Appellant asserts that he presented evidence at the PCRA hearings that established that Z.M.'s death was caused by an accidental fall down the stairs. ***Id.*** at 31. Appellant argues that the presentation of flawed scientific evidence undermined the fundamental fairness of his trial, which was a violation of his due process rights. ***Id.*** at 32-

33. Appellant cites several federal *habeas corpus*[11] cases and decisions from other states in support of his due process claim. *Id.* Appellant emphasized that his claim is not an after-discovered evidence claim. Appellant's Reply Brief at 22.

The Commonwealth treated Appellant's medical science claim as an after-discovered evidence claim, not as a due process claim. Commonwealth's Brief at 35-42. Specifically, the Commonwealth responded that Appellant's theory that the victim died as a result of a fall down the stairs is implausible based on the evidence presented at trial, including a lack of hair or blood on the dumbbells Appellant claims that the victim's head hit as she fell. *Id.* at 37-39. The Commonwealth contends that most of the studies cited by Appellant's experts at the PCRA hearings already existed at the time of his trial. *Id.* at 42. The Commonwealth notes that Doctor Maffei described the Atkinson study as "absolutely not compelling", and interpreted the Atkinson study as stating more research was necessary regarding its conclusions. *Id.* at 41.

This Court has explained that

_____

[11]   Under 28 U.S.C. § 2254(d), federal *habeas* relief may be granted to a state prisoner only if the state court's review of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts. . . ."

*Commonwealth v. Lesko*, 15 A.3d 345, 363-64 (Pa. 2011).

- 25 -

our standard of review from the denial of a PCRA petition is limited to examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal error. The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions.

***Commonwealth v. Sandusky***, 203 A.3d 1033, 1043 (Pa. Super. 2019) (citations omitted and formatting altered), *appeal denied*, 216 A.3d 1029 (Pa. 2019).

"To be entitled to PCRA relief, appellant must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the enumerated errors in 42 Pa.C.S. § 9543(a)(2) . . . ." ***Commonwealth v. Robinson***, 82 A.3d 998, 1005 (Pa. 2013).

Section 9543 provides in relevant part:

**(a) General rule.—**To be eligible for relief under this subchapter, the petitioner must plead and prove by a preponderance of the evidence all of the following:

\* \* \*

(2) That the conviction or sentence resulted from one or more of the following:

(i) A violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

\* \* \*

(vi) The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.

42 Pa.C.S. § 9543(a)(2)(i), (vi).

"It is well-settled that the PCRA is intended to be the sole means of achieving post-conviction relief. Unless the PCRA could not provide for a potential remedy, the PCRA statute subsumes the writ of *habeas corpus*." ***Commonwealth v. Taylor***, 65 A.3d 462, 465-66 (Pa. Super. 2013) (citing, *inter alia*, 42 Pa.C.S. § 9542, and ***Commonwealth v. Fahy***, 737 A.2d 214, 223-24 (Pa. 1999)). "Issues that are cognizable under the PCRA must be raised in a timely PCRA petition and cannot be raised in a *habeas corpus* petition." ***Id.*** at 466 (citation omitted); ***see also Commonwealth v. Moore***, 247 A.3d 990, 996-97 (Pa. 2021) (holding that the defendant's claim that the statute under which he was sentenced was void for vagueness implicated the legality of his sentence and must be raised in a PCRA petition and not in a petition for writ of *habeas corpus*).

Our Supreme Court has treated claims about advances in scientific understanding, which were not available at the time of trial, as claims of after-discovered evidence under the PCRA. ***See, e.g.***, ***Commonwealth v. Albrecht***, 720 A.2d 693, 706-07 (Pa. 1998) (discussing a claim regarding advances in fire investigation science in the context of after-discovered evidence under Section 9543(a)(2)(vi)).

It is well settled that an after-discovered evidence claim requires a petitioner to establish that "(1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to

impeach credibility; and (4) it would likely compel a different verdict" if a new trial were granted. *Commonwealth v. Cox*, 146 A.3d 221, 228 (Pa. 2016) (citation omitted). "The test is conjunctive; the defendant must show by a preponderance of the evidence that each of these factors has been met in order for a new trial to be warranted." *Commonwealth v. Padillas*, 997 A.2d 356, 363 (Pa. Super. 2010) (citations omitted).

In determining "whether the alleged after-discovered evidence is of such nature and character that it would likely compel a different verdict if a new trial is granted[,] a court should consider the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, and the overall strength of the evidence supporting the conviction." *Id.* at 365 (citations omitted).

The PCRA court correctly evaluated Appellant's claim as an after-discovered evidence claim under the PCRA, the sole means for post-conviction relief, and concluded that the Atkinson study was not after-discovered evidence and that the Commonwealth's experts did not rely on faulty medical science at trial. *See* PCRA Ct. Op., 7/1/20, at 6-19. Specifically, the PCRA court noted that Appellant presented experts at his trial who opined Z.M. sustained her injuries in an accidental fall. *See id.* at 17-19. The PCRA court concluded that the evidence presented at the PCRA hearings was not after-discovered evidence because Appellant used it to impeach and challenge the credibility of the Commonwealth's experts from trial, and that the disagreement between Appellant's experts and Commonwealth's experts did

not establish that the Commonwealth's experts relied on false or faulty science. *See id.* at 15-16, 19.

We recognize that Appellant has argued that he is entitled to relief because the presentation of purportedly flawed scientific evidence at trial violated his due process rights, and he asserts that he is not presenting an after-discovered evidence claim. However, under Pennsylvania law, "the PCRA is intended to be the sole means of achieving post-conviction relief" and a claim that is cognizable under the PCRA must be raised in a PCRA petition, and not in a request for *habeas* relief. *See Taylor*, 65 A.3d at 465-66; *see also Moore*, 247 A.3d at 996-97. Further, under the PCRA, a claim regarding new scientific evidence which undermines or discredits the scientific evidence presented at trial is properly raised as an after-discovered evidence claim under Section 9543(a)(2)(vi), and not as a due process claim.[12] *See* 42

_____

[12] Even if we were to treat Appellant's claim as a due process claim and not an after-discovered evidence claim under the PCRA, we would necessarily follow the precedent of the appellate courts of this Commonwealth and the United States Supreme Court. Appellant relies on federal *habeas* decisions and decisions from the courts of other states, which are generally not binding on this Court and are not cognizable under the PCRA. *See Commonwealth v. Hicks*, 208 A.3d 916, 936 n.13 (Pa. 2019) (holding decisions of the Third Circuit are not binding on the courts of this Commonwealth), *cert. denied*, 140 S. Ct. 645 (2019); *Commonwealth v. Lukach*, 163 A.3d 1003, 1009 n.5 (Pa. Super. 2017) (decisions of the federal courts and the courts of other states have persuasive value only); *see also Commonwealth v. Beshore*, 916 A.2d 1128, 1140 (Pa. Super. 2007) (*en banc*) (holding that "the failure to develop an adequate argument in an appellate brief **may** [] result in waiver of the claim under Pa.R.A.P. 2119" (citation and quotation marks omitted, emphasis added)).

*(Footnote Continued Next Page)*

Pa.C.S. § 9543(a)(2); *Moore*, 247 A.3d at 996-97; *Taylor*, 65 A.3d at 465-66.

Based on our review of legal authority and this record, we agree with the PCRA court that Appellant's claim that the Commonwealth's medical evidence was flawed is meritless. Appellant argues that the Commonwealth's scientific evidence was faulty because his expert witnesses testified at trial that the Shaken Baby Syndrome was a controversial diagnosis, Z.M.'s fatal injuries could have been the result of a fall down the stairs, and he presented evidence that injuries such as retinal hemorrhages should not automatically be diagnosed as the result of child abuse. *See* PCRA Ct. Op., 7/1/20, at 5-19. The PCRA court observed that Appellant had not shown that the medical community generally accepted his evidence consistent with Pa. Rule of Evidence 702(c), and further that disagreement between experts did not establish the medical evidence was false or faulty. *See id.* at 18-19. Appellant has not shown that the PCRA court abused its discretion in its evidentiary rulings concerning the conflicting expert testimony presented by the Commonwealth and Appellant. *See Sandusky*, 203 A.3d at 1043. Therefore, we affirm on the basis of the PCRA's court opinion and conclude

---

In any event, Appellant's due process claim, which could be raised under the federal *habeas* statute, is not cognizable under the PCRA; therefore, the trial court properly considered his claim as after-discovered evidence under the PCRA and determined in its discretion that Appellant is not entitled to relief. *See* 42 Pa.C.S. § 9543(a)(2)(i) (relating to PCRA relief for violations of the United States and/or Pennsylvania Constitutions); *Robinson*, 82 A.3d at 1005.

that Appellant is not entitled to relief.[13]  **See** PCRA Ct. Op., 7/1/20, at 5-19; **see also Cox**, 146 A.3d at 228.

### Subpoena for Doctor Land

In his final issue, Appellant claims that the PCRA court erred when it denied his motion to compel Doctor Land to comply with Appellant's subpoena to testify at his PCRA evidentiary hearing.  Appellant's Brief at 34-35. Appellant argues that Doctor Land was an important witness and that Appellant was indigent.  **Id.** at 34.  Appellant contends that "[t]he Sixth Amendment guarantees a criminal defendant the right to compulsory process. The right to offer testimony is fundamental."  **Id.** at 35 (citing **Washington v. Texas**, 388 U.S. 14 (1967); **Commonwealth v. Holloman**, 621 A.2d 1046 (Pa. Super. 1993)).  Appellant asserts "that Doctor Land could be transformed from a prosecution witness to a defense witness when faced with the new science presented by nationally recognized experts indicating the injuries sustained by [the victim] could have come from a short fall."  **Id.**  Appellant further contends that PCRA court's "order forcing the indigent Appellant to pay $375.00 for Doctor Land's appearance denied [Appellant] the Sixth Amendment right to confront witnesses, and denied due process, and tainted the legitimacy of the PCRA [c]ourt's findings of fact and conclusions of law."

---

[13] The PCRA court's citations on page 6 of its June 30, 2020 opinion should read "**Commonwealth v. Abu-Jamal**, 720 A.2d 79 (Pa. 1998)", "**Commonwealth v. Schuck**, 164 A.2d 13 (Pa. 1960)", and "**Commonwealth v. Foreman**, 55 A.3d 532 (Pa. Super. 2012)".

Appellant's Reply Brief at 24; *see also id.* at 12, 20 (arguing that the PCRA court violated his right to confrontation because of his indigency).

The Commonwealth responds that under 42 Pa.C.S. § 5903, an expert witness who has been served with a subpoena to testify is entitled to receive compensation for that testimony. Commonwealth's Brief at 42-43. The Commonwealth contends that Appellant's arguments that he was not calling Doctor Land as an expert witness is contradicted by the type of testimony Appellant was seeking from Doctor Land and the fact that Doctor Maffei was qualified as an expert at a prior PCRA hearing in this case. *Id.* at 43.

We review a trial court's decision to enforce or quash a subpoena for an abuse of discretion. *See Commonwealth v. Walsh*, 36 A.3d 613, 620 (Pa. Super. 2012); *see also Commonwealth v. McKenzie*, 581 A.2d 655, 657-58 (Pa. Super. 1990). This Court "may affirm the decision of the [PCRA] court if there is any basis on the record to support the [PCRA] court's action; this is so even if we rely on a different basis in our decision to affirm." *Commonwealth v. Wiley*, 966 A.2d 1153, 1157 (Pa. Super. 2009) (citation omitted).

This Court has observed that

under both our state and federal constitutions, a criminal defendant has a right of compulsory process to obtain witnesses in his favor. The right to compulsory process encompasses the right to meet the prosecution's case with the aid of witnesses, and the right to elicit the aid of the Commonwealth in securing those witnesses at trial, both of which are fundamental to a fair trial. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This

right is a fundamental element of due process of law. [***Washington***, 388 U.S. at 19]. The constitutional right, though fundamental, is not, however, absolute. **In order to compel the attendance of a witness at trial, it must be shown that the information possessed by the witness is material, *i.e.*, capable of affecting the outcome of the trial, and that it is favorable to the defense.** *United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982).

*McKenzie*, 581 A.2d at 657 (some citations and quotation marks omitted) (emphasis added); *see also Commonwealth v. Banks*, 946 A.2d 721, 725 (Pa. Super. 2008) (holding that, to establish a violation of his or her right to compulsory process, "the defendant must make some plausible showing of how the witnesses' testimony would have been both material and favorable to the defense" (citation and some formatting omitted)).

A defendant seeking to compel the attendance of a witness is "not relieved of the burden of showing that the missing witness would have given favorable [and material] testimony merely because the defense did not have prior access to the witness." *Commonwealth v. Lahoud*, 488 A.2d 307, 311 (Pa. Super. 1985). "In such circumstances it is of course not possible to make any avoval of **how** a witness may testify. But the events to which a witness might testify, and the relevance of those events to the crime charged, may well demonstrate either the presence or absence of the required materiality." *Id.* (citation omitted and emphasis in original).

Further, this Court has held that a defendant's right to confrontation is a right that applies at trial, and does not apply to PCRA evidentiary hearings. *Commonwealth v. Wantz*, 84 A.3d 324, 337 (Pa. Super. 2014).

The PCRA court explained that:

Doctor Land is a forensic pathologist who performed an autopsy on the victim nine (9) years ago and testified seven (7) years ago as an expert witness in the trial. Doctor Land never testified as a fact or ordinary witness, but as an expert witness and [Appellant] sought to call him for the purpose of determining whether new scientific evidence would cause Doctor Land to change any portion of the expert opinion given at the trial of [Appellant]. Clearly, Doctor Land was being asked to render an expert opinion based on the Atkinson [study] utilizing his special knowledge and experience.

The evidence of record does not support the assertion that the Commonwealth should have to pay for [Appellant's] witness or that Doctor Land is an ordinary witness entitled to ordinary witness fees under 42 Pa. C.S.[] § 5903. Doctor Land is an expert witness who [Appellant] sought to compel attendance and testimony at [Appellant's] evidentiary hearing, therefore Doctor Land is entitled to reasonable compensation for his time and such reasonable compensation should be at his customary expert rates.

\* \* \*

For these reasons, the [PCRA c]ourt denied [Appellant's] motion.

PCRA Ct. Op., 11/13/20, at 11-12.

Here, Appellant argues that the PCRA court should have enforced the subpoena and compelled Doctor Land to testify without being paid his expert witness fee because Doctor Land could have changed his opinion about the cause of Z.M.'s fatal injuries when confronted with new medical science. We conclude that Appellant has failed to establish that Doctor Land's testimony would have been favorable to him. *See Banks*, 946 A.2d at 725; *McKenzie*, 581 A.2d at 657. Appellant has only offered speculation that Doctor Land would change his opinion about the cause of Z.M.'s injuries based on the

- 34 -

Atkinson study.[14] Because Appellant failed to make a plausible showing that Doctor Land's testimony would have been favorable to him, we conclude the PCRA court did not abuse its discretion in denying Appellant's motion to enforce subpoena. **See Walsh**, 36 A.3d at 620; **McKenzie**, 581 A.2d at 657. Furthermore, because the right to confrontation does not apply at post-conviction proceedings, we conclude that the PCRA court did not violate Appellant's right to confront witnesses by denying his motion to compel Doctor Land to comply with the subpoena. **See Wantz**, 84 A.3d at 337. Therefore, we affirm the PCRA court's order, albeit on a different basis. **See Wiley**, 966 A.2d at 1157.[15]

For these reasons, we affirm the PCRA court's order denying Appellant's PCRA petition.

_____

[14] We note that at trial, Doctor Land did not base his conclusion that Z.M.'s injuries were the result of abuse solely on the presence of retinal hemorrhaging. Specifically, Doctor Land testified that he did not believe that Z.M. injuries could have been the result of her falling down the stairs and hitting her head on the dumbbells because Z.M. did not have any injuries consistent with falling onto a hard object like the dumbbells. **See** N.T. Trial, 10/18/11, at 283-84.

[15] Insofar as Appellant argued that because he was indigent, the PCRA court should have ordered Doctor Land to testify without Appellant having to pay his expert witness fee or to require the Commonwealth to pay Doctor Land's fee, Appellant is incorrect. The proper procedure for an indigent defendant to obtain expert testimony is to request the court to provide public funds to hire an expert. **See, e.g.**, **Commonwealth v. Reid**, 99 A.3d 470, 505 (Pa. 2014); **Albrecht**, 720 A.2d at 707. Appellant made no such request before the PCRA court, nor has he argued in his brief that he should have been provided with public funds to pay Doctor Land's fee. Therefore, this claim is waived. **See** Pa.R.A.P 302(a); **Felder**, 247 A.3d at 20.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/08/2021

**IN THE COURT OF COMMON PLEAS**
**OF LUZERNE COUNTY**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | |
| VS. | : | CRIMINAL DIVISION |
| LAMONT CHERRY | : | NO. 3610 OF 2009 |

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY:**

On October 20, 2011, after a jury trial, Lamont Cherry was convicted of third degree murder in the death of Zalayia McCloe. The Defendant was sentenced on December 21, 2011 to a term of twenty (20) to forty (40) years imprisonment. The Defendant filed a direct appeal to the Pennsylvania Superior Court on January 20, 2012 and on July 12, 2013, the Superior Court of Pennsylvania affirmed the Trial Court.

In June of 2014, the Defendant, acting pro se, filed a Post-Conviction Relief Act Petition (PCRA) with court appointed counsel. The Defendant was assigned court appointed counsel and the PCRA was denied on June 18, 2015. The Defendant filed a timely appeal, and was appointed conflict counsel. On February 6, 2017, the Superior Court remanded the PCRA case and directed the trial court to determine if Attorney Cheryl Sturm would represent the Defendant and if so she was allotted time to file a supplemental PCRA. Attorney Sturm filed a Memorandum of Law in Support of the PCRA Petition on May 12, 2017, and was afforded time to conduct discovery i.e. retrieve the Defendant's homicide file from the Luzerne County Public Defender's Office or the Office of Law.

Thereafter, on October 24, 2017, the Defendant filed an Amended PCRA Petition. On November 3, 2017, the Defendant filed a Motion to Continue the PCRA hearing that

1

was granted. The Defendant filed a Motion to Continue the Evidentiary Hearing on December 4, 2017 that was granted and the hearing was rescheduled to May 21, 2018. On March 1, 2018, the Defendant files a Supplement to Pending PCRA Petition and Amended PCRA Petition. On May 21, 2018, the first PCRA hearing was conducted and a second date was set. Upon review of the Defendant's witness availability and in consultation with counsel of record, the second hearing date was scheduled for November 9, 2018. The Defendant then filed a Motion to Compel Compliance with Subpoena on October 29, 2018 regarding the testimony of Commonwealth's trial witness Dr. Samuel Land. On December 17, 2018, a hearing occurred regarding the Motion to Compel. As a result of the motion to compel argument, an evidentiary hearing was scheduled for June 21, 2019. On May 21, 2019, the Defendant filed a Motion to Continue the Evidentiary Hearing and the Court granted the Motion and rescheduled the hearing for August 12, 2019.

The PCRA Hearing was completed on August 12, 2019, and the transcripts of the three PCRA Hearings were ordered so post-trial submissions could be supplemented.

The PCRA pending before the court raises the issues that trial counsel was ineffective for not filing a motion to bar a second trial based on the double jeopardy clause of the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution. Additionally, the Defendant raised the claim that his right to due process was violated in that the Commonwealth presented false or flawed science to obtain his conviction. The trial court denied the Defendant's PCRA by Order and Memorandum dated June 30, 2020.

The Memorandum dated June 30, 2020, is incorporated herein regarding issue II presented by the Defendant.

2

On July 30, 2020, the Defendant filed a Notice of Appeal to the Pennsylvania Superior Court. On August 21, 2020 the Court Ordered Defendant to file a Concise Statement of Errors Complained of on Appeal pursuant to Pa. R.A.P. 1925(b). The Defendant's Concise Statement of Errors Complained of on Appeal was filed on September 20, 2020 raising four (4) issues.

## QUESTIONS AT ISSUE:

The following represents this Court's opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a) regarding Petitioner's appeal of the denial of his Amended PCRA Petition. In his Statement of Matters Complained of on Appeal, Mr. Cherry raises four (4) errors:

I. The PCRA Court erred in denying Mr. Cherry's Motions for Recusal;

II. The PCRA Court erred in not finding that Appellant's conviction was obtained and sentence imposed upon the prosecution's presentation and/or use of false or flawed science supported by false and flawed expert testimony in violation of the right of due process; **(Addressed in Memorandum dated June 30, 2020, attached hereto)**

III. The PCRA Court erred in finding that Appellant did not meet the burden of proof to establish ineffective assistance of counsel on the issue that Mr. Ruzzo was ineffective on failing to raise a double jeopardy issue; and

IV. The PCRA Court erred in not enforcing Appellant's subpoena for the testimony of Samuel Land, M.D. for the evidentiary hearing.

## LAW:

**I.     Whether the undersigned judge erred by denying Petitioner's Motion for Recusal?**

Petitioner claims that the undersigned judge erred by refusing to recuse herself from Appellant's PCRA Petition for the following reasons:

3

1. The first order denying the PCRA Petition was dated shortly after the Petition was filed and included clerical irregularities;

2. The Court did not hold a *Grazier* hearing or remove Appellant's court appointed PCRA counsel who did not provide effective representation;

3. The PCRA Petition presents the issue that the undersigned judge is responsible for the mistrial and alleged double jeopardy violation.

Pursuant to Rule 2.11 of the Code of Judicial Conduct, a trial judge must "disqualify himself or herself in any proceeding in which the judge's impartiality might be reasonably questioned." The party who asserts that a trial judge must be disqualified must "produce evidence establishing bias, prejudice, or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially." *Arnold v. Arnold,* 847 A.2d 674, 680 (Pa. Super. 2004).

> The party who asserts that a trial judge must be disqualified must "produce evidence establishing bias, prejudice, or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially." *Arnold v. Arnold,* 847 A.2d 674, 680 (Pa.Super.2004) (citation omitted). There is a presumption that judges of this Commonwealth are "honorable, fair and competent," *In re Lokuta,* 11 A.3d at 453 (2011) (citation omitted), and, when confronted with a recusal demand, are able to determine whether they can rule "in an impartial manner, free of personal bias or interest in the outcome," *Arnold,* 847 A.2d at 680 (citation omitted). If the judge determines he or she can be impartial, "the judge must then decide whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. This is a personal and unreviewable decision that only the jurist can make." *Id.,* at 680–681 (citation omitted). A judge's decision to deny a recusal motion will not be disturbed absent an abuse of discretion. *See In re Lokuta,* 11 A.3d at 435.

*Lomas v. Kravitz,* 130 A.3d 107, 122 (Pa. Super. 2015)(affirmed 170 A.3d 380 (Pa. 2017).

The judge herself, is most qualified to determine her ability to preside impartially. *Commonwealth v. Harris,* 979 A.2d 387, 391-92 (Pa. Super. 2009).

4

In applying these standards, Pennsylvania appellate courts have addressed what evidence and circumstances rise to the level of bias, prejudice or unfairness or the appearance of those factors dictating recusal. Recusal may be warranted where a judge has personal knowledge of disputed facts and will become a witness in the proceeding. *Municipal Publications, Inc. v. Court of Common Pleas*, 489 A.2d 1286 (Pa. 1985). Recusal is also required when the appearance of impropriety arises because of a judge's pecuniary interest in a case or a consanguineal relationship between the judge and one of the litigants. *Dennis v. Southeastern Pennsylvania Transportation Authority*, 833 A.2d 348, 353 (Pa. Cmwlth. 2004).

Conversely, in *Commonwealth v. Blakeney*, 946 A.2d 645 (Pa. 2008), our Supreme Court held that recusal was not required in a capital murder case where the trial judge had signed documents in the defendant's divorce case and sat on the prison board when the defendant instituted litigation against the prison. The court held that a trial judge is not required to recuse herself when the grounds alleged are "too remote, peripheral and impersonal to warrant a conclusion that [she] would be other than fair and impartial". Id. at 662.

Petitioner requested recusal based on the allegation that this Court pre-judged his petition as evidenced by irregularities in the Order denying his petition. The Order was filed on June 18, 2015 and was dated June 18, 2014. This was an obvious clerical error and in no way implies the Court pre-judged the merits of the petition without the opportunity for Mr. Cherry to present his case at a hearing. Similarly, Petitioner alleges that the Court was biased or the appearance of impropriety existed because some of the dates cited in the procedural history portion of the opinion accompanying the order were

5

incorrect. Again, these were clerical, not substantive errors and are certainly not evidence of bias, prejudice or prejudgment. The substance of the opinion discussed the merits of Mr. Cherry's petition.

Next, Petitioner sought recusal alleging his court appointed PCRA counsel provided no representation and, therefore, the Court should have held a *Grazier* hearing to determine whether Petitioner wanted to proceed *pro* se. 713 A.2d 81, 82 (Pa. 1998). The Superior Court has determined that Mr. Cherry was effectively denied his right to assistance of counsel, vacated this Court's decision and remanded the case so Mr. Cherry could obtain new counsel and file an amended petition. *Commonwealth v. Cherry*, 155 A.3d 1080, 1083 (Pa. Super. 2017). This, however, does not cast any doubt on the Court's continued ability to preside over the case impartially and, as previously discussed, this Jurist has never wavered in her ability to preside without prejudice or bias and there is no evidence to suggest otherwise. To the contrary, the court granted multiple requests for continuances and other accommodations requested by the Defendant. The Petition was filed in June 2014 and a hearing was scheduled for August 2014, which was continued until November 2014 at the request of the Defendant. At the time of the November 2014 hearing, there was another request by the Defendant for a continuance which was granted. (N.T. 1/16/15 Hearing, p. , ll. 15-25; p. 12, l. 1) The Court granted a motion for defense counsel to speak with the Defendant via telephone.(Id. p. 3, ll. 2-3) During the January 16, 2015 hearing, Mr. Cherry confirmed that, per his request, he was provided all of the trial transcripts for his personal review and that he had the opportunity to review them. (Id. p. 4, ll. 1-12) At the hearing, Mr. Cherry's counsel stated that after speaking with Mr. Cherry, it was Mr. Cherry's decision

6

to proceed on the original petition as opposed to offering testimony. (Id. at p. 4, ll. 13-21) Upon counsel's confirmation that, upon review of the transcripts, there was nothing additional to offer with respect to recusal, the trial court likewise confirmed that there was nothing in the motion or transcripts which would lead her to reconsider her decision to deny the motion to recuse. (Id. at p. 4, ll. 22-25; p. 5, ll. 1-19).

Lastly, Petitioner contends that because his Petition raises the issue of whether the Trial Court caused the mistrial and resulting alleged double jeopardy violation, recusal was required. After careful consideration, the Court determined that juror misconduct in bringing outside evidence into the deliberation room created a manifest necessity for a mistrial. This Court recognizes and respects the Defendant's right to challenge and seek review of the Court's rulings and the Defendant's exercise of his rights in no way affected this Court's ability to decide his Petition in a fair and unbiased manner.

In his motion for recusal filed on May 23, 2017, Defendant alleged numerous grounds for recusal. None of these allegations constitute evidence that this Court was unable to act impartially and without personal bias or prejudice with respect to this matter or raise sufficient grounds for recusal. A series of meritless allegations cannot be combined together to create a simple cumulative claim of bias. *Commonwealth v. Kearney*, 92 A.3d 54, 62 (Pa. Super. 2014). The Defendant's claims have no merit, and when each are examined individually, they do not form a sufficient basis for recusal, nor are they sufficient when examined as a whole.

This Court has presided over this case since 2010. There are no instances in the record where the trial judge displayed or articulated displeasure or impatience toward the Petitioner. After careful consideration of the points raised by Petitioner in his Motion for

7

Recusal, this Court made a conscientious determination that it was able to assess the case in an impartial manner, without any personal bias toward Petitioner or the Commonwealth or interest in the outcome. Furthermore, this Jurist disagrees that her continued involvement in the case created an appearance of impropriety or would tend to undermine public confidence in the judiciary.

II. **Whether the trial court erred in not finding that Appellant's conviction was obtained and sentence imposed upon the prosecution's presentation and/or use of false or flawed science supported by false and flawed expert testimony in violation of the right of due process?**

A PCRA hearing was conducted on August 12, 2019. Thereafter, on June 30, 2020 the trial court issued a memorandum that specifically addressed the issues raised in Issue 2. Accordingly, the memorandum dated June 30, 2020 is incorporated herein and attached as Exhibit A.

III. **Whether the PCRA Court erred in finding that Appellant did not meet the burden of proof to establish ineffective assistance of counsel on the issue that Mr. Ruzzo was ineffective on failing to raise a double jeopardy issue?**

Regarding the issue of ineffective assistance of counsel, Defendant did not present any testimony or evidence at any of the PCRA hearing as to the ineffective assistance of counsel. As noted in the PCRA Memorandum dated June 30, 2020, page 19, no witnesses were called regarding the double jeopardy issue. It should be noted that the Defendant had three (3) attorneys including William Ruzzo, Christopher O'Donnell and Michael Kostelaba during the trial who were not called to further the double jeopardy issue. At the conclusion of the PCRA hearing on August 12, 2019, defense counsel moved to withdraw the ineffective assistance claim regarding the vital interest instruction, however, noted that the double jeopardy issue remained. Thereafter, the parties were

8

ordered to file Post-Trial Submissions regarding the pending PCRA issues. The Defendant's submissions did not include any argument regarding the ineffective assistance of counsel double jeopardy issue. The evidentiary record was closed upon submissions. At this time, the Defendant has not met its burden of proof to establish ineffective assistance of counsel.

At the evidentiary hearings, Petitioner limited his claim to faulty/flawed science. He did not present any evidence as to ineffectiveness of counsel. When considering a claim of ineffective assistance of counsel in a petition for post-conviction relief, counsel is presumed to have provided effective representation unless the petitioner pleads and proves that (1) the underlying claim is of arguable merit, (2) counsel had no reasonable basis for his or her conduct, and (3) the petitioner was prejudiced by counsel's action or omission. *Commonwealth v. Perry*, 959 A.2d 932, 936 (Pa.Super.2008) A court is not required to analyze the elements of an ineffectiveness claim in any particular order of priority; if a claim fails under any necessary element, the court may proceed to that element first. *Commonwealth v. Cousar*, 154 A.3d 287, 297 (Pa. 2017). A distorted hindsight review cannot determine the reasonableness of counsel's decisions. *Commonwealth v. Saranchak*, 866 A.2d 292, 304 (Pa. 2005).

The Pennsylvania Supreme Court has a preference for an evidentiary hearing on counsel's strategy before determining there was a lack of a reasonable basis for his actions or inactions and has cautioned against speculating about the reasons for counsel's actions in the absence of an evidentiary hearing, except in the clearest of cases." *Cousar* at 299; *Commonwealth v. Geathers*, 847 A.2d 730, 737, n. 2 (Pa.Super.2004) (citing *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014, 1023

9

(2003)). "Failure to present any evidence...during the PCRA hearing is fatal to a claim." *Commonwealth v. Spotz*, 896 A.2d 1191, 1219 (Pa. 2006). Petitioner "had the responsibility of bringing all of his evidence to the PCRA hearing" and failed to cite any legal authority to support his contentions that he was not required to do so contention in his appellate brief."); *see also Commonwealth v. Bracey*, 795 A.2d 935, 940 n. 4 (Pa.2001) ("An underdeveloped argument, which fails to meaningfully discuss and apply the standard governing the review of ineffectiveness claims, simply does not satisfy Appellant's burden of establishing that he is entitled to relief."); *see also* Pa.R.A.P. 2119(b).

Petitioner did not advance any evidence or cite to any legal precedent to establish a claim of ineffective assistance of counsel. Petitioner relied on the death of his trial counsel prior to the evidentiary hearing for his failure to present evidence on the issue. When trial counsel has died and is therefore unavailable to testify, the Petitioner's burden of establishing a claim of ineffective assistance of counsel is not lessened or reduced. *Commonwealth v. Simpson*, 112 A.3d 1194, 1197 (Pa. 2015). While Petitioner's burden to prove counsel's ineffectiveness is made more difficult, it is not obviated or lessoned by these circumstances. *Commonwealth v. Rega*, 933 A.2d 997, 1018–19 (Pa. 2007). Here, other than making the claim that trial counsel did not have a reasonable basis for not filing a motion to bar the second trial on the basis of double jeopardy and therefore rendered ineffective assistance of counsel, Petitioner did nothing to advance this claim.

For these reasons, the Court finds that the Petitioner waived his ineffective assistance of counsel claim.

10

**IV.    Whether the trial court erred in not requiring Samuel Land, M.D. to testify on behalf of the Petitioner without compensation.**

On May 21, 2018 an evidentiary hearing was held wherein Dr. Zhongxue Hua and Dr. Frank Maffei were called by the Petitioner to testify. On December 17, 2018, an oral argument was held on the Petitioner's Motion To Compel Compliance Of Samuel Land, M.D. With Subpoena To Appear And Give Testimony At The Evidentiary Hearing Scheduled For November 9, 2018 Without Payment Beyond Ordinary Witness Fee. The Petitioner subpoenaed Dr. Land for the purpose of determining whether new scientific evidence presented through the testimony of Dr. Hua and Dr. Maffei would cause Dr. Land to change any portion of the expert opinion given at the trial of Petitioner.

The Petitioner argued that he should have the right to recall as on cross examination, Dr. Land, as the Commonwealth's expert witness to confront him with the alleged new science that has emerged since the trial. Dr. Land was not being called by the Commonwealth to testify. Dr. Land is a forensic pathologist who performed an autopsy on the victim nine (9) years ago and testified seven (7) years ago as an expert witness in the trial. Dr. Land never testified as a fact or ordinary witness, but as an expert witness and Petitioner sought to call him for the purpose of determining whether new scientific evidence would cause Dr. Land to change any portion of the expert opinion given at the trial of the Petitioner. Clearly, Dr. Land was being asked to render an expert opinion based on the Atkinson Survey utilizing his special knowledge and experience.

The evidence of record does not support the assertion that the Commonwealth should have to pay for the Petitioner's witness or that Dr. Land is an ordinary witness entitled to ordinary witness fees under 42 Pa. C.S.A. §5903. Dr. Land is an expert witness who Petitioner sought to compel attendance and testimony at Petitioner's

11

evidentiary hearing, therefore Dr. Land is entitled to reasonable compensation for his time and such reasonable compensation should be at his customary expert rates.

Dr. Land had the option of filing a Motion to Quash, but did not do so in that he was willing to testify provided that he is compensated and provided adequate time for review in advance of his testimony the Atkinson Survey.

For these reasons, the Court denied Petitioner's motion.

## CONCLUSION:

The foregoing represents this court's opinion regarding Defendant's appeal from the denial of his PCRA Petition.

**END OF OPINION**

12

# IN THE COURT OF COMMON PLEAS
## OF LUZERNE COUNTY

COMMONWEALTH OF PENNSYLVANIA :

           VS. : <u>CRIMINAL DIVISION</u>

LAMONT CHERRY : NO. 3610 OF 2009

## <u>ORDER</u>

NOW, this 30th day of June, 2020, after a hearing held on August 14, 2019, wherein all parties were present, **IT IS HEREBY ORDERED AND DECREED** that the PCRA Petition filed by the Defendant on June 4, 2014 is hereby **DENIED**

The Clerk of Courts is directed to enter this Order of Record and to mail a copy of this Order to all counsel of record or, if unrepresented, to each party pursuant to Pa.R.Crim.P. 114.

BY THE COURT:

POLACHEK GARTLEY, J.

Copies:

✓Jill Matthews, Esquire, Luzerne County District Attorney

✓Cheryl J. Sturm, Esquire
387 Ring Road
Chadds Ford, PA 19317

CLERK OF COURTS CRIMINAL
LUZ CNTY JUN30'20PM3:27



## IN THE COURT OF COMMON PLEAS
## OF LUZERNE COUNTY

COMMONWEALTH OF PENNSYLVANIA :

VS.                                        :          <u>CRIMINAL DIVISION</u>

LAMONT CHERRY                    :          NO. 3610 OF 2009

## <u>MEMORANDUM</u>

### <u>INTRODUCTION:</u>

This memorandum is filed to address the issues raised in the motion for post conviction collateral relief filed by Defendant, Lamont Cherry, on June 4, 2014, and the Amended PCRA petition filed on October 24, 2017. The PCRA pending before the court raises the issues that trial counsel was ineffective for not filing a motion to bar a second trial based on the double jeopardy clause of the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution.[1] Additionally, the Defendant raised the claim that his right to due process was violated in that the Commonwealth presented false or flawed science to obtain his conviction.

### <u>PROCEDURAL HISTORY:</u>

On October 20, 2011, after a jury trial, Lamont Cherry was convicted of third degree murder in the death of Zalayia McCloe. The Defendant was sentenced on December 21, 2011 to a term of twenty (20) to forty (40) years imprisonment. The Defendant filed a

CLERK OF COURTS CRIMINAL
LUZ CNTY JUN30'20PM3:27

---

[1] Mr. Cherry withdrew his ineffective assistance of counsel claim as it relates to the "vital interest" instruction during the course of the evidentiary hearing. Trial counsel died while the PCRA is pending and no testimony was taken on the double jeopardy issue. Mr. Cherry does not withdraw this claim of ineffective assistance of counsel and argues that there was no strategic reason not to move to bar the second trial under the double jeopardy clause. Trial counsel was ineffective for all the reasons stated in the pending PCRA.

1

direct appeal to the Pennsylvania Superior Court on January 20, 2012 and on July 12, 2013, the Superior Court of Pennsylvania affirmed the Trial Court.

In June of 2014, acting pro se filed a Post-Conviction Relief Act Petition (PCRA). With court appointed counsel. The Defendant was assigned court appointed counsel and the PCRA was denied on June 18, 2015. The Defendant filed a timely appeal, and was appointed conflict counsel. On February 6, 2017, the Superior Court remanded the PCRA case and directed the trial court to determine if Attorney Cheryl Sturm would represent the Defendant and if so she was allotted time to file a supplemental PCRA. Attorney Sturm filed a Memorandum of Law in Support of the PCRA Petition on May 12, 2017, and was afforded time to conduct discovery i.e. retrieve the Defendant's homicide file from the Luzerne County Public Defender's Office or the Office of Law.

Thereafter, on October 24, 2017, the Defendant filed an Amended PCRA Petition. On November 3, 2017, the Defendant filed a Motion to Continue the PCRA hearing that was granted. The Defendant filed a Motion to Continue the Evidentiary Hearing on December 4, 2017 that was granted and the hearing was rescheduled to May 21, 2018. On March 1, 2018, the Defendant files a Supplement to Pending PCRA Petition and Amended PCRA Petition. On May 21, 2018, the first PCRA hearing was conducted and a second date was set. Upon review of the Defendants witness availability and in consultation with counsel of record, the second hearing date was scheduled for November 9, 2018. The Defendant then filed a Motion to Compel Compliance with Subpoena on October 29, 2018 regarding the testimony of Commonwealth's trial witness Dr. Samuel Land. On December 17, 2018, a hearing occurred regarding the Motion to Compel. As a result of the motion to compel argument, an evidentiary hearing was

2

scheduled for June 21, 2019. On May 21, 2019, the Defendant filed a Motion to Continue the Evidentiary Hearing and the Court granted the Motion and rescheduled the hearing for August 12, 2019.

The PCRA Hearing was completed on August 12, 2019, and the transcripts of the three PCRA Hearings were ordered so post-trial submissions could be supplemented.

The PCRA pending before the court raises the issues that trial counsel was ineffective for not filing a motion to bar a second trial based on the double jeopardy clause of the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution. Additionally, the Defendant raised the claim that his right to due process was violated in that the Commonwealth presented false or flawed science to obtain his conviction.

## LEGAL ANALYSIS

In order to be eligible for relief pursuant to the provisions of the PCRA statute, a petitioner must prove by a preponderance of the evidence that his conviction or sentence resulted from one or more of the seven enumerated circumstances set forth at 42 Pa.C.S.A. § 9543(a)(2). In addition, a petitioner must demonstrate that the issues raised have not been previously litigated or waived, and that failing to litigate the issue prior to or during trial or a direct appeal could not have been the result of any rational strategic decision by counsel. 42 Pa.C.S.A. § 9543(a)(3).

The timeliness requirements for the filing of PCRA petitions pursuant to 42 Pa.C.S. § 9545(b) provide as follows:

(b) Time for filing petition.—

(1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:

3

(i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;

(ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held to apply retroactively.

(2) Any petition invoking an exception provided in paragraph (1) shall be filed within 60 days of the date that the claim could have been presented.

(3) For purposes of this subchapter, a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review.

(4) For purposes of this subchapter, "government officials" shall not include defense counsel, whether appointed or retained.

42 Pa.C.S. § 9545(b)(1)-(4).(This statute is pre amendments of October 2018)

The Commonwealth initially argues that the PCRA filed by the Defendant is untimely in that it falls under the "newly discovered evidence" exception that is subject to a deadline of sixty (60) days of the date it could have been presented. The PCRA statute was amended in October 2018 and expanded the time of filing from sixty (60) days to one year from the date the claim could have been presented, noting that the amendments only applies to claims arising one year before the effective date

4

(December 24, 2017). Upon review of the dates of filing, the statute cited above is applicable noting the sixty (60) day requirement.

On June 4, 2014, the Defendant filed a timely PCRA that was denied on June 18, 2015. The Defendant appealed the denial of the PCRA. A review of the procedural history indicates that on February 6, 2017, the Superior Court remanded the appeal of the PCRA to the trial court reinstating the PCRA and directing the the trial court to determine if Attorney Sturm would represent the Defendant and if so she was allotted time to file a supplemental PCRA which she did on October 24, 2017. Prior to that date she filed a Memorandum of Law in Support of the PCRA Petition on May 12, 2017, and was afforded time to conduct discovery as noted above. Specifically, the Defendant required access to the homicide file and orders were directed to the Luzerne County Public Defender's Office and/or the Office of Law to produce the files to current defense counsel.

Based upon the review of the procedural history, he PCRA currently pending before the court is in fact the first timely filed PCRA. Accordingly, the Defendant satisfied the timeliness requirement.

PCRA relief is available to a defendant if it is proven that the evidence was "unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced". 42 Pa. C.S. § 9543(a) (2)(VI).

A defendant is required to establish, by a preponderance of the evidence, the following criteria in order to be entitled to PCRA relief:

> 1) the evidence was discovered after trial and could not have been obtained earlier "through" reasonable diligence;

5

2) the evidence is not cumulative;

3) it is not being used solely to impeach credibility; and

4) it would likely compel a different verdict.

The test to determine relief is conjunctive, meaning that the defendant must show by a preponderance of the evidence that each of the listed factors has been met. *Commonwealth v. Abu-Jamal*, 720 A.2d 795 (Pa. 1988); *Commonwealth v. Padillas*, 997 A.2d 356 (Pa. Super. 2010); *Commonwealth v. Damato*, 856 A.2d 806 (Pa. 2004).

Unavailability of evidence is determined by the standard regarding whether or not it could have obtained at trial by reasonable diligence. *Commonwealth v. Shuck*, 368 U.S. 884 (1961). Our Courts have held that evidence shall not be considered unavailable at trial unless it was discovered after the trial and could not have been obtained by reasonable diligence.

Evidence is deemed exculpatory under the newly discovered evidence if it tends to establish the Defendant's innocence of the crimes charged as differentiated from that which, although favorable, is merely collateral or impeaching. *Commonwealth v. Redmond*, 577 A.2d 547 (Pa. Super. 1990); *Commonwealth v. Shuck, supra*. Most importantly, newly discovered evidence that impeaches the credibility of a witness is not exculpatory for the purposes of § 9543(a)(2)(VI). *Commonwealth v. Galloway*, 640 A.2d 454 (Pa. Super. 1994); *Commonwealth v. Swarman*, 55 A.3d 552 (Pa. Super. 2012).

In turning to the effect of the evidence on the outcome of a trial, it is satisfied if the newly discovered evidence would change finding or the degree of guilt. In *Commonwealth v. Bulted*, 279 A.2d 158 (Pa. 1971), a defendant was convicted of first-degree murder in the killing of his wife and presented a defense that the wife was seeing another man was

6

granted a new trial upon the discovery of the other man who acknowledged the relationship. *Commonwealth v. Bulted*, 279 A.2d 158 (Pa. 1971). In that case, the court held that a jury is given great discretion to choose among the various degrees of homicide and a second trial would be likely to produce a different result if the later newly discovered evidence was admissible. *Id.*

The Defendant asserts that in 2017 Dr. Norrell Atkinson authored a scientific study regarding head injuries on children that are akin to the injuries suffered by Zalayia McCloe. The Defendant further asserts that the "Atkinson Scientific Study", and the testimony of Dr. John Galaznik and Dr. Zhongxue Hua are new evidence under the guise of new science asserting that since 2011 relative to the characteristics of Abusive Head Trauma/Shaken Baby Syndrome undermines the reliability of the jury's verdict and presents an alternate theory for the source of Zalayia McCloe injuries. (Defendant's Post Evidentiary Hearing Memorandum).

In turn, the Commonwealth argues that Pennsylvania PCRA law does not mention a basis of relief for a conviction based on "flawed or faulty science" and notes this basis for relief is found in habeas corpus claims. The Commonwealth asserts that Defendant has not cited a single case in Pennsylvania that denotes that a PCRA is "the proper vehicle for this claim". (Commonwealth's Response Brief in Opposition to Post-Evidentiary Hearing). The Commonwealth further asserts that the Defendant has failed to prove new science, new medical idea or revolution and has only provided studies that illustrated cases where an accidental fall or shaking of a certain animal proved a different result and that the article authored by Dr. Atkinson is simply an article in a pediatric journal. Lastly, the Commonwealth asserts that the jury during the trial of 2011, heard

7

experts from the defense who asserted that the injuries were from an accidental fall and rendered a verdict. (Commonwealth's Response Brief in Opposition to Post-Evidentiary Hearing).

The first point of review is whether the 2017 Atkinson report or article is new medical evidence. The Defendant argues newly discovered medical evidence warrants a new trial.

In reviewing, the basis of the request made by counsel in what the Defendant deems as faulty science, defendant intends to introduce a study completed by Dr. Norrell Atkinson in 2017 that was admitted as Exhibit 5 wherein a series of cases of short falls with occipital impact leading to subdural hemorrhage (SDH) were reviewed. The head injuries sustained could be from short falls or standing positions.

### Childhood Falls With Occipital Impacts a/k/a The Atkinson Report

Defendants referred to the article entitled *Childhood Falls With Occipital Impacts* as the Atkinson report. *Childhood Falls With Occipital Impacts* is an article that appeared in the Pediatric Emergency Care Publication in 2017. The article is authored by Norrell Atkinson, M.D., Rick R. VanRign, M.D., Ph.D. and Suzanne P. Starling, M.D. The Commonwealth argued that the Atkinson article is just that, an article and although it is dated 2017, the article cites case studies from as far back as 2007 up to and including 2011 also the time of the homicide trial.

It should be noted that the Defendant's Exhibit 5, *Childhood Falls With Occipital Impacts* states directly on the top of the page "Original Article". A detailed review of the Atkinson document lists four (4) descriptions as to its bases; objectives, methods, results, and conclusions.

8

**Objectives:** Falls are commonly reported in children who present with both accidental and inflicted brain injuries. Short falls rarely result in serious or life-threatening injuries. Our purpose is to describe a series of cases of short falls with occipital impact leading to subdural hemorrhage (SDH).

**Methods:** We present a series of 8 witnessed accounts of young children diagnosed as having SDH's after striking the back of their heads during a short all. Child-abuse physicians were surveyed to determine if they had evaluated a child younger than 24 months diagnosed as having SVH, with or without retinal hemorrhages, following a witnessed fall with occipital impact. Submitted cases were analyzed.

**Results:** The median age of the children was 12.5 months. All fell backward from a standing or seating position onto a hard surf ace and immediately developed symptoms. There was an average of 4 witnesses per case. Physical examinations were normal; however, the majority of children had enlarged head circumferences. All were previously healthy. Six of 8 children had unilateral convexity SDH. All children had varying degrees of retinal hemorrhage but no retinochisis. The majority of children had returned to their baseline within 24 hours of hospitalization.

**Conclusions:** Although a larger study is needed to identify the full spectrum of injuries, we postulate that, if a history of a fall with an occipital impact is elicited during a trauma workup, accidental injury should be considered.

At the PCRA hearing, Dr. Frank Maffei, the Commonwealth's witness at trial reviewed the Atkinson Article, after being subpoenaed by the Defense, and described the article as "the lowest quality of evidence" in that it was survey based, meaning people responded to a survey regarding injuries to minor children. He attested that the study was based upon the responses of individuals that were involved in the injuries caused to the child. He did not deem the Atkinson Article as new science and noted that his review of the article would change his opinion as to the cause of death of Zalayia McCloe. Dr. Maffei stated that the he was aware of the studies regarding causes of injury in children with

injuries similar to Zalayia's and noted that many of studies were done prior to October 201 or the time of trial (N.T. 76).

To further argue that there is a new medical evidence that warrants a new trial, Defendant called Dr. John Galaznik, an expert in the field of pediatrics with a focus on physical injury of small children. Dr. Galaznik offered testimony that was akin to an expert witness in trial as to the cause of death of Zalyia McCloe wherein he discussed and reviewed her medical records, testimony from trial, the opinions of the Commonwealth experts. In addition, he conducted a review of the testimony offered at trial and offered a vast array of reasons he disagreed with their findings and conclusions; a review of the American Academy of Pediatrics statements on Child Abuse and Neglect and how they are or should be adjusted since 2011 and noted that it should be reviewed, withdrawn, modified or retired after five years. Through his detailed review of other cases, in other states, he discussed how fact specific injuries could lead to a different reason for the cause of death.

The Commonwealth argues that Dr. Galaznik is a paid consultant; did not do a physical exam of an infant in over 30 years, never performed an autopsy on an infant, never testified for the prosecution. The Commonwealth argued that the witness relied on studies involving piglets and lambs and not on human cadavers.

The defense articulated in their brief the basis of Dr. Galaznik's testimony: "He testified that science now recognizes that a short fall can cause the triad of injuries the State's expert claimed could only be caused by Shaken Baby Syndrome and/or Abusive Head Trauma." When asked by the Commonwealth if the American Academy

of Pediatrics acknowledged the new science he attested to, he responded in the negative and added – "no, not yet". (N.T. 8-12/19 p. 105).

Regarding the Atkinson Article, Dr. Galaznik disagreed with the opinion of Dr. Maffei and went into a detailed analysis as to scientific basis of the Atkinson Study. He noted that surveys were sent out, they received 23 responses and after testing and hospital approval eight cases of accidental falls were accepted and deemed as truly accidents. He concluded by saying, "So I think it is a pivotal article, not something to be disregarded". (N.T. 8-12-19p.71).

Dr. Zhongxue Hua testified for the defense as an expert in the field of forensic pathology and neuropathology. Dr. Hua, again in detail refuted the Commonwealth's expert testimony and offered his opinion on the cause of death. He testified that he went through the trial testimony of the Commonwealth expert witnesses and disagreed with the findings. The testimony presented was what one would expect during trial, as opposed to a hearing to determine if the Atkinson Article was actually new medical evidence. Regarding the Atkinson Article, Dr. Hua mentioned the Atkinson Article when he stated that publications were being published and people were mumbling and started to look at these type of cases holistically and learn from their mistakes. (N.T. 5-18-18 p. 46-47). Although Defendant cites a plethora of authority for cases in Federal Court or neighboring states, he did not provide any analogous cases in the state of Pennsylvania.

In attempting to determine the introduction of what would be deemed newly discovered medical evidence, the case law leads to the introduction of DNA testing as new medical evidence. It is clear that a review of the standards regarding DNA evidence in the state of Pennsylvania is warranted. With the introduction of DNA evidence, PCRA

11

courts granted the request for DNA testing to achieve finality in cases and often held that DNA evidence was a recognizable form of after discovered evidence. Our courts noted that DNA may not have been unattainable at trial because the technique was not yet available and "that it had exculpatory potential". *Commonwealth v. Reese*, 663 A.2d 206 (Pa. Super. 1995). Even with the introduction of DNA, the courts were still required to do an analysis to determine if DNA would be the basis for PCRA relief. Moreover, DNA testing was acknowledged by both the scientific community and the courts as an "accurate means of matching cellular material to a specific person". In *Commonwealth v. Brison*, 618 A.2d 420 (Pa. Super. 1992), the court acknowledged the scientific communities acceptance of DNA testing and held that in light of questions concerning the identification of the assailant coupled with the fact that there was no physical evidence linking the defendant to the crime, principles of justice "required a DNA test to be performed, noting that the test results that would exclude the defendant as the assailant may have been sufficient create a reasonable doubt. *Id.*

Specifically, the DNA test was unequivocally accepted both by the scientific community and the courts as an accurate means of matching cellular material to a person.

In returning to the standards set forth by the Pennsylvania Courts, to obtain relief based on what has been qualified as newly discovered evidence, the Defendant is required to establish the four (4) factors. First and foremost, the Atkinson Article, by the Defendant's expert witness has not been accepted by the American Academy of Pediatrics has not yet published any articles or reports acknowledging a new medical science based on the Atkinson Article or any of the studies discussed by the witnesses. That same witness, after providing detailed testimony for the basis and authenticity of the

Atkinson Article stated that he thought the article was pivotal, not to be disregarded. This statement is a far cry from new medical evidence that is accepted by the medical community. The argument that the *Atkinson* study and the testimony of a doctor that testified in numerous other hearings as a consultant does not in and of itself fit the criteria established by the Pennsylvania Courts for new evidence.

Dr. Maffei reviewed the Atkinson Article and stated that it would not change his opinion as to the cause of death of Zalayia McCloe. As noted above, the court accepted DNA evidence because the medical community and the court system acknowledged its reliability and definitive value. The new science averred by the Defendants is a matter of opinion, based on fact specific cases. Moreover, the intent of the Atkinson article and the testimony of the witnesses, was to alert the medical community that there can be explanations for certain injuries to children that are not SBS/AHT.

The Conclusion, as specifically stated in the Atkinson Article notes that "a larger study is needed" and concludes with "accidental injury **should be considered**". This language is not definitive, nor does in negate the opinions and conclusions of the experts that testified at trial.

In evaluating the factors for the introduction of new evidence or faulty science, the trial court must determine that the evidence was discovered after trial and could not have been obtained earlier through reasonable diligence. The Defendant argues that the *Atkinson* article was published in 2017 after the trial. As noted above, Atkinson article is based on a limited study, that the authors state requires a larger study. The majority of the case studies listed in the article occurred prior to the trial of Mr. Cherry. Moreover, the defense presented at the trial was that the injuries were accidentally sustained.

13

The defense presented testimony at trial that the injuries sustained by the victim, were the result of an accident; i.e. she fell down the stairs. If Dr. Galaznik was allowed to testify, it is cumulative and offers the exact same opinion as to the cause of death as the witnesses called at trial by the Defendant. The testimony of Dr. John Galaznik, M.D. offered the opinion that the findings and the injuries sustained by the minor child can be fully accounted for by a short distance fall with occipital impact against a hard surface. This opinion offered by Dr. Galaznik is the same testimony that was offered at trial by the defense expert Dr. John P. Lenox, M.D. who argued that the injuries sustained by the victim in this case clearly could have been the result of a short distance fall. In fact, Dr. Lenox testified at trial as to a published article by Dr. Patrick Lance where children sustained traumatic injuries in a short fall. Dr. Lenox offered testimony and illustrated how the fall from the stairs could cause the injuries suffered.

The third requirement of newly discovered evidence is that it is not being offered to solely to impeach credibility. In the case at bar, Defendant called as a witness the Commonwealth expert Dr. Frank Maffei who treated Zalayia McCloe when she was brought to the hospital. At the time, she was alive. During the course of the trial, Dr. Maffei testified as to the injuries of the child and his opinion as to the cause of the fall.[2]

Although the Defendant argued that the state's experts testified that a short fall could only be caused by Baby Syndrome and/or Abusive Head Trauma, the trial record belies this assertion. Dr. Samuel Land specifically answered the inquiry as to whether an accident could have caused the injuries as follows: "There are possibilities that occur every day that we cannot account for. Now, it is certainly possible that a child of Zalayia's

---

[2] Commonwealth contends that many of the citations found in the Defendant's brief are from the opening statement and are not actually attributed to the doctor's testimony at trial.

14

age, weight, and height could come tumble down a full set of stairs and die from those injuries. However, the injury pattern that I would expect to see would be different from what we see here today. And furthermore, it would not explain the whiplash-type injuries at the base of the skull and the back of the neck. (T.T. p. 290:12-19). The doctor acknowledged an accident could cause the injuries and explained, in his opinion, why he believed otherwise. In another instance, the defense specifically asked Dr. Lamb it was possible that "a child a year or say six months would fall down six or seven carpeted steps, suffer subdural hematoma, severe retinal hemorrhage: Do you think that's possible?" Dr. Land answered, "Again – it is possible, but I would need to know more about the situation, more about the other injury pattern on the child before I could say that it was probable". (T.T. 290-291).

In the PCRA, the Defendant avers that Dr. Maffei testified that "retinal injuries have never been reported in a child falling down stairs". (Defendant's Brief page 12). Dr. Maffei actually stated, "The injury that's never been reported is the retinal injuries to the degree that she had". (T.T. p. 53: 5-6). Clearly, the answer was directed to the circumstances specific to the Zalayia McCloe and not a general statement that the retinal injuries have never been reported in a child falling down the stairs.

Throughout the evidentiary hearing, all of the witnesses called by the Defendant offered differing opinions on the cause of death, source of injuries, methods employed and relied on by the Commonwealth's witnesses. Dr. Maffei was cross examined, and the Atkinson article was used to impeach his trial testimony. Our courts have long held that the purported newly discovered evidence also cannot be used solely to impeach credibility. The testimony presented in the context of the PCRA hearing before the Court

was for impeachment and to challenge credibility rather than refute false or faulty evidence.

Amongst other cases, Defendant cites *People v. Bailey*, 144 A.D. 3d (1562) Supreme Court of New York, Fourth Department, (2016), wherein a trial court overturned a conviction based on false and faulty science by expert witnesses who testified that a short fall cannot produce the same triad of symptoms. This case is easily distinguishable. In this case, the Defendant did in fact call witnesses who asserted the defense of accident arguing that it was probable that the child suffered a fall. More importantly, both Dr. Maffei and Dr. Land entertained the possibility that an accident could have caused the injuries. Newly discovered evidence is not meant to simply provide the last prong necessary for the introduction of newly discovered evidence addresses whether the evidence would likely compel a different verdict.

In the case at bar, the Defendant called Dr. John B. Lenox as an expert in the field of head and neck injury, trauma and medical research, injury causation and biomechanics. Dr. Lenox set forth the defense that the child sustained the injuries in a short fall. The defense also called Marguerite Salan-Host, M.D. as a pathologist. Dr. Salan-Host testified in detail at the trial to the injuries of Zalayia McCloe using a written report and her opinion in which she argued that the death was accidental. In addition to testifying that the cause of death was accidental she told the jury that there was an ongoing academic debate within the medical profession when looking at retinal hemorrhages and automatically concluding it was child abuse. She specifically noted to the jury that there is a debate "amongst the entire medical field with regard to reviewing these type of injuries". (T.T. pp. 471-472:1-7). In addition, the doctor attested to the jury

16

that the child's injuries were not consistent with Shaken Baby Syndrome, noting that the child had a skull fracture on the left base of the brain and blood around the brain that would not be evidence of Shaken Baby Syndrome. She noted that when Shaken Baby Syndrome occurs, "there is usually no fracture. You have retinal hemorrhages because of the tear of the brain going back and forth but that's it. There should be no fracture. Once it's a fracture. Once it's a fracture it's a traumatic brain injury". (T.T. pp. 470-471). The doctor further indicated that there was no bruising and ordinarily there would be hand patterns on the arms or upper body or the neck of a child suffering Shaken Baby Syndrome. (T.T. p. 471). The testimony of the defense doctor at trial put forth all of the theories that the defense is now attempting to use as new science.

The Defendant also asserts that the other defense doctor, Michael D. Ambrosio, M.D. testified to the jury at trial that he never saw a child die from falling down two steps. This was specifically noted in Defendant's brief page 14. However, a review of transcript illustrates that Dr. Ambrosio was specifically asked if he was reviewing current literature and scholarly journals with regard to traumatic brain injury and abuse of head trauma. His answer was as follows: "As - - the topic of traumatic brain injury and abusive head trauma is something that's, in my opinion and in the opinion of the medical community controversial. So I am constantly looking at this, and we are constantly discussing trauma surgeons at our institution and - - I didn't look at something specifically or more articles but it is something we constantly do in our CME and in our daily search as part of normal medical training" (T.T. pp. 488-89).

At the time of trial, the defense presented multiple witnesses that asserted accidental injury was the cause of death. These same witnesses told the jury about the

17

debate in the medical society regarding the reason and basis for diagnosis of traumatic brain injury and abusive head trauma. The jury was made fully aware that this issue was not a settled proposition and was left to the independent opinion of doctors.

As noted, Dr. Ambrosio, testified and told the jury that based upon his report and review of all of the documentation regarding Zalayia McCloe's death; it was his opinion that it could have been an accident. This opinion was coupled with the information he conveyed to the jury as to the ongoing debate in the medical community as to the basis of this type of injury. He further told the jury he does not agree that it was or had to be a result of an abusive head trauma. (T.T. p. 489).

In reviewing the criteria necessary to deem newly discovered evidence, it is clear that the jury was fully apprised of the controversy in the medical field as to the diagnosis of Shaken Baby Syndrome and Abusive Head Trauma. The Defendant's witnesses specifically and directly advised the jury of the debate within the medical field and the diagnosis. Moreover, two (2) of the defense medical experts told the jury it was their medical opinion that the child died of an accidental fall. The defense cites numerous cases wherein courts vacated convictions based upon new medical evidence. However, the distinguishing factor in this case is that no documentation has been submitted that the medical community has changed their position that the injuries related to Shaken Baby Syndrome are no longer applicable. Defendant cites *In Re: Pers Restraint of Fiero*, 192 Wn.App.138, 367 P.3d 588, 2016 Wash.App.8 (Washington 2016), wherein Post Conviction Relief was granted based upon medical evidence. However, in this case, it was asserted that the medical community changed since the trial and the change was generally accepted in the medical community.

In the case at bar, Defendant argues that the *Atkinson* article creates newly discovered evidence. They have failed to meet this burden. Just as the two (2) defense experts testified in trial, there is an ongoing discussion and debate within the medical community regarding subdural hematomas, retinal hemorrhages, Shaken Baby Syndrome and child abuse allegations. The jury heard from three (3) defense witnesses as to their opinion on the injuries being accidental and were advised of the debate within the medical community with the diagnosis of these conditions. They also heard the Commonwealth's experts opine that a fall down the stairs could have caused the injury and their reasons why they did not believe her death was accidental. Simply because the current witnesses disagree with the Commonwealth's witnesses does not create false or faulty science.

Regarding the issue of ineffective assistance of counsel, Defendant did not present any testimony or evidence at any of the PCRA hearings. No witnesses were called regarding the double jeopardy issue. It should be noted that the Defendant had three (3) attorneys including William Ruzzo, Christopher O'Donnell and Michael Kostelaba during the trial who were not called to further the double jeopardy issue. At the conclusion of the PCRA hearing on August 12, 2019 defense counsel moved to withdraw the ineffective assistance claim regarding the vital interest instruction, however, noted that the double jeopardy issue remained. Thereafter, the parties were ordered to file Post-Trial Submissions regarding the pending PCRA issues. The Defendant's submissions did not include any argument regarding the ineffective assistance of counsel double jeopardy issue. The evidentiary record was closed upon submissions. At this time, the Defendant has not met its burden of proof to establish ineffective assistance of counsel.

19

Based on the Foregoing, the PCRA Petition is Denied.

BY THE COURT:

POLACHEK GARTLEY, J.